[No. B070097. Second Dist., Div. Five. June 14, 1993.]

A LOCAL AND REGIONAL MONITOR, Plaintiff and Appellant, v.
CITY OF LOS ANGELES et al., Defendants and Respondents;
UC LAND ASSOCIATES et al., Real Parties in Interest.

**COUNSEL**

Sabrina S. Schiller for Plaintiff and Appellant.

James K. Hahn, City Attorney, Claudia McGee Henry, Assistant City Attorney, Patricia V. Tubert, Keith Pritsker, Gail C. Weingart and Diane Smith Stepheson, Deputy City Attorneys, for Defendants and Respondents.

Allen, Matkins, Leck, Gamble & Mallory, Patrick E. Breen, Anthony J. Oliva, Mark R. Hartney, Lee A. Shirani, Nat Chavira, Paul Hastings, Janofsky & Walker and Michael S. Woodward for Real Parties in Interest.

**OPINION**

**TURNER, P. J.—**

## I. INTRODUCTION

Plaintiff, A Local and Regional Monitor (ALARM) appeals from the denial of its petition for writ of mandate to compel the City of Los Angeles to set aside and rescind the certification of an environmental impact report (EIR) which was adopted for a 40-story commercial office building project located on the northwest corner of Sixth and Boylston Streets which was proposed by real party in interest, UC Land Associates, as part of its Los Angeles Center Master Plan project. Plaintiff contends on appeal we should order the trial court to issue a writ of mandate commanding the city: (1) to set aside its approval of the first portions of the Los Angeles center project until the EIR examines the environmental impact of the project as a whole and the city's general plan complies with state law, and (2) to complete and update its general plan as required by state law. For the reasons stated below, we affirm.

## II. FACTUAL AND PROCEDURAL HISTORY

### A. *The Central City West Specific Plan*

In order to assess the issues in this case, we begin by discussing briefly the background of how the project at issue originated and its relationship to Los Angeles's Central City West (CCW) Specific Plan which was adopted by the Los Angeles City Council on February 20, 1991, and became effective April 3, 1991. The CCW plan provided for the development of 23.5 million square feet of nonresidential development and 14,500 housing units in the areas within the Westlake Community Plan and the Silver Lake-Echo Park District Plan. The CCW area consists of approximately 465 gross acres,

bounded on the north by the Hollywood Freeway, on the east by the Harbor Freeway, on the south by Olympic Boulevard, and on the west by Glendale Boulevard, Witmer Street, and Union Avenue. The area is part of an extensive expansion and redefinition of "Los Angeles city central core." The specific plan was developed through a partnership between the public and private sectors. The procedures taken to adopt the specific plan were long, exhaustive, and detailed. They included: (1) private sector financing to hire a consultant team; (2) background reports and expert information; (3) public review and comment at various stages of the process; (4) public meetings and workshops; (5) input from individual homeowners and business owners; (6) neighborhood meetings; (7) meetings with and input from the California Department of Transportation, the Southern California Association of Governments, the Southern California Rapid Transit District, and the Los Angeles County Transportation Commission due to traffic considerations; and (8) formal public hearings with oral testimony and written communications. The result of the effort was a very detailed and comprehensive plan for the redevelopment of the City of Los Angeles which was adopted in February of 1991.

## B. *The Los Angeles Center Master Plan and the 40-Story Project*

Before the CCW Specific Plan was adopted, the developer, UC Land Associates, applied to the city's director of planning for a project plan review under its proposed specific plan. The 40-story project at issue in this case is part of UC Land Associate's "Los Angeles Center Master Plan," an integrated project, which is to be located between Fourth and Sixth Streets and the Harbor Freeway and Bixel Street. The master plan consists of a long-range development of 5 million square feet of a mixed commercial office, retail, and hotel complex on 14 to 17 acres. The master plan would be constructed in several phases beginning with phase IA which is known as the East Tower and is the subject of this litigation. The proposed project is described in the final EIR as follows: "The project applicant, UC Land Associates, wishes to initially build a 914,000-square-foot building and in the future develop the approximately three-block Los Angeles Center in accordance with the General Plan, i.e., a regional center commercial project. In addition, it is the objective of the project sponsor to develop the proposed Los Angeles Center to meet the goals and objectives of the proposed Central City West Specific Plan. The applicant wishes to produce an integrated site development which not only serves as a focal point for the area, but which also will allow large open plazas and pedestrian areas. [¶] The project applicant will apply for a project development permit for a mixed-use (office/retail) building at the northwest corner of Sixth and Boylston Streets

within the Central City West Area subsequent to completion of a Final EIR. The approximate 5,000,000-square-foot conceptual Los Angeles Center Master Plan is proposed to be constructed in several phases, commencing with the East Tower (Phase IA). Build-out of the conceptual Master Plan for the Los Angeles Center would total approximately 4,270,200 square feet of office space, 179,800 square feet of retail uses and a 550,000-square-foot, 500-room hotel. [¶] The entire Los Angeles Center project, as presently conceptualized, would include the following: one 40-story tower and one 41-story tower with approximately 890,200 gross square feet of office space and 23,800 gross square feet of retail space each (one tower represents Phase IA, the East Tower, and one represents Phase IB, the West Tower), each with four levels of above-grade parking and five levels of below-grade parking for the two towers. The East and West Towers will have the same approximate floor areas even though the West Tower (Phase IB) is planned to be slightly taller (576 feet). This is due to a lower ground elevation and greater internal height to the entrance lobby in the West Tower. In addition to the East and West Towers the remainder of the conceptual Los Angeles Center will consist of a two-story retail structure (Phase IB1) adjacent to the northeast corner of the Phase IA tower; a 10 to 11 story office building with retail space on the first two floors (Phase IIA); a 65-story office tower with retail space on the first two floors utilizing the existing four level below-grade parking structure with 1,269 spaces and an additional four levels of below-grade parking (Phase IIB); a 25-story hotel structure consisting of approximately 500 rooms with banquet and conference facilities and retail space on the first two floors, along with three levels of above-grade parking and four levels of below-grade parking (Phase IIIA); and a 35-story office tower with ground floor retail space, three levels of above-grade parking and four levels of below-grade parking (Phase IIIB). [¶] There are a number of urban design, transportation and transit improvements that are proposed as elements of the draft Central City West (CCW) Specific Plan. All of the transportation and transit improvements are designed to mitigate the traffic effects of the development associated with the Specific Plan and facilitate the movement to and from the area. As such, all the improvements will benefit the conceptual Los Angeles Center Master Plan. Where these elements would have physical implications for the Los Angeles Master Plan, they have been a factor in the conceptual design for the area."

## C. The EIR

The developer submitted an environmental assessment form in May 1989. The Environmental Review Committee (ERC) of the City of Los Angeles Planning Department determined that an EIR was required to address a

number of potential environmental impacts. A draft EIR for the project was prepared and circulated for public review and comment between September 30, 1990, and October 29, 1990. A noticed public hearing was held on May 30, 1991. The director of planning approved a plan review for the phase IA project on August 12, 1991, subject to certain modifications and conditions. On August 16, 1991, ALARM[1] filed a notice of appeal with the city planning commission to challenge the director's decision approving the project on the grounds: (1) the EIR was insufficient because it failed to examine the cumulative impacts from all phases of the project and all the reasonably foreseeable projects within the area of the project; (2) the EIR did not address the full extent of impacts that will be caused by the project; and (3) the project was inconsistent with the city's general plan. The developers also appealed from certain of the director's conditions. On October 10, 1991, following a public hearing, the city planning commission denied ALARM's appeal and granted the developer's appeal in part. ALARM appealed this decision to the city council. The city council planning and land management committee held a noticed public hearing on December 3, 1991, and recommended denial of ALARM'S appeal. On December 11, 1991, the city council denied ALARM's appeal, adopted the planning commission's findings, certified the staged EIR, and approved the project.

### D. *The Petition for Writ of Mandate*

On January 13, 1992, ALARM and Ms. Pope filed a petition for writ of mandate in the superior court in which they challenged the city's approval of the commercial building project on the grounds that the approval violated the requirements of the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[2] and the complex did not conform with the requirements of the city's general plan, including the circulation element. Plaintiff named as respondents the City of Los Angeles, the Los Angeles City Council, and its individual members in their official capacities, The Los Angeles City Planning Commission, UC Land Associates, and Unocal Corporation, a lessee of space in phase IA of the project. The petition alleged the city had never adopted the circulation element of the general plan as required by Government Code section 65302, subdivision (b) and the land use element as required by Government Code section 65302, subdivision (a). The city was also alleged to have failed to revise its housing element (first approved on Sept. 24, 1986) as required by Government Code section 65588.

---

[1]The remaining plaintiff, Katherine Pope, who is not a party to the appeal, did not participate in the administrative review process. Because of our resolution of the issues raised in this appeal, we need not address her lack of standing to sue in superior court.

[2]All further statutory references are to the Public Resources Code unless otherwise indicated.

The petition further alleged the EIR adopted by the city for the project at issue in this case was improper because: (1) it only examined phase IA and did not review other projects including the "Master Plan"; (2) the addendum to the EIR which contemplated the addition of square footage to a different project required a supplemental EIR; and (3) the EIR's traffic analysis as to the impact from excavation and dirt hauling trucks from phase IA of the project was deficient. The original petition contained four causes of action and sought to compel the City of Los Angeles to set aside and rescind certification of the phase IA EIR and approval of phase IA (first and third causes of action). Plaintiff also sought a declaration that the city's general plan was inadequate (fourth cause of action) as well as an order directing the Los Angeles City Planning Commission and the Los Angeles City Council to prepare and approve "a legally adequate" general plan (second cause of action). The city moved for judgment on the pleadings on the first and second causes of action on the grounds that they were barred by the statute of limitations and the doctrine of laches because they were based on the "claimed inadequacy of the general plan" which was adopted on April 3, 1974, and the lawsuit was not brought within 120 days of the legislative act as required by Government Code section 65009, subdivision (c). The trial court granted the motion with leave to amend. ALARM's first amended petition sought: (1) to compel the city to adopt a legally adequate general plan; (2) to compel the city to adopt a legally adequate EIR which accurately examined all important adverse environmental impacts and to consider the project in its entirety; and (3) a new declaration of consistency with the general plan. The trial court denied the petition and this timely appeal followed.

## III. Discussion

### A. *Standard of Review*

The parties dispute the standard of review. Citing Code of Civil Procedure section 1094.5 and *Concerned Citizens of Calaveras County* v. *Board of Supervisors* (1985) 166 Cal.App.3d 90, 96 [212 Cal.Rptr. 273], plaintiff argues an appellate court is required to review the agency decision de novo under an arbitrary, capricious, or evidentiary basis standard, with "absolutely no deference" to the trial court's decision. However, as the city correctly notes this standard is used for reviewing general plan decisions and not the sufficiency of an EIR. (*Ibid.*; *Twain Harte Homeowners Assn.* v. *County of Tuolumne* (1982) 138 Cal.App.3d 664, 673 [188 Cal.Rptr. 233].) Therefore, insofar as plaintiff seeks review of the sufficiency of the EIR, the standard of review is not de novo but " '*the traditional, deferential substantial evidence test*' " (*A Local & Regional Monitor* v. *City of Los Angeles*

(1993) 12 Cal.App.4th 1773, 1792-1793 [16 Cal.Rptr.2d 358], original italics) pursuant to section 21168.5.[3] The Supreme Court has concluded: "In reviewing agency actions under CEQA, Public Resources Code section 21168.5 provides that a court's inquiry 'shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' Thus, the reviewing court ' "does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document." ' [Citations.] [A reviewing court] may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. '[The court's] limited function is consistent with the principle that "[t]he purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations." ' [Citations.]" (*Citizens of Goleta Valley* v. *Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161].) Although CEQA requirements must be enforced, the reviewing court must not substitute its judgment for that of the people and its local representatives. (*Ibid.*)

### B. *CEQA and the State Guidelines*

Section 21061 provides in part: "An [EIR] is an informational document . . . . The purpose of an [EIR] is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." In order for public agencies to implement the requirements of CEQA, the Legislature ordered the Governor's Office of Planning and Research to prepare guidelines which "shall include objectives and criteria for the orderly evaluation of projects and the preparation of environmental impact reports . . . ." (§ 21083.) ██ The guidelines are embodied in title 14 of the California Code of Regulations, section 15000 et seq.[4] and state that they "are binding on all public agencies in

---

[3]Section 21168.5 provides: "In any action or proceeding, other than an action or proceeding under Section 21168, to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence."

[4]Future references to Guidelines are to title 14 of the California Code of Regulations.

California." (Guidelines, § 15000.)[5] ■ Our Supreme Court has noted: "The foremost principle under CEQA is that the Legislature intended the act 'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' [Citation.]" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390 [253 Cal.Rptr. 426, 764 P.2d 278].) The purpose of the EIR, which "has been aptly described as the 'heart of CEQA', . . . is to inform the public and its responsible officials of the environmental consequences of decisions *before* they are made." (*Citizens of Goleta Valley v. Board of Supervisors, supra,* 52 Cal.3d at p. 564, original italics.) An EIR is required whenever a public agency proposes to approve or carry out any project which may have a significant effect on the environment. (§§ 21100, 21151; Guidelines, § 15002, subd. (f)(1).) A significant effect on the environment is defined as "a substantial, or potentially substantial, adverse change" in the physical conditions which exist in the area affected by the proposed project. (§ 21068; Guidelines, § 15002, subd. (g).) When an EIR identifies a significant effect, the public agency must make findings on how the effects have been substantially reduced or explain why they have not. (Guidelines, §§ 15002, subd. (g), 15091.)

## C. *The EIR on Phase IA*

Although plaintiff raises a number of issues in this appeal, the gist of the argument is twofold. First, it argues the city council should be compelled to set aside its approval of the EIR on the project because it was done on a "piece by piece" basis as opposed to an examination of the whole project. Second, plaintiff contends the city council's finding concerning the consistency of the project with the general plan is in error because the general plan itself does not comply with state law.

### 1. *The "Piece by Piece" Contention*

■ Plaintiff's primary contention is that the EIR on the phase IA project should not have been approved and certified because it was not examined with the entire Los Angeles Center Master Plan and as a "whole

---

[5]While the Supreme Court has declined to hold the Guidelines are regulatory mandates as opposed to interpretive aids, courts are "at a minimum" required to " 'afford great weight to [them] except when a provision is clearly unauthorized or erroneous under CEQA.' [Citation.]" (*Citizens of Goleta Valley v. Board of Supervisors, supra,* 52 Cal.3d at p. 564, fn. 3.) Under the standards set forth in the Guidelines, an EIR must "identify and focus on the significant and environmental effects of the proposed project." (Guidelines, § 15126, subd. (a).)

action" within the meaning of the CEQA and the Guidelines. (§ 21065;[6] Guidelines, §§ 15002, subd. (d), 15378, subds. (a) & (c).[7]) The term " 'project' " is defined " 'broadly' " and encompasses "the whole of an action which has a potential for resulting in physical change in the environment, directly or ultimately, and includes the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies." (*Burbank-Glendale-Pasadena Airport Authority* v. *Hensler* (1991) 233 Cal.App.3d 577, 592 [284 Cal.Rptr. 498]; see also *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 278 [118 Cal.Rptr. 249, 529 P.2d 1017]; *Sierra Club* v. *County of Sonoma* (1992) 6 Cal.App.4th 1307, 1315 [8 Cal.Rptr.2d 473]; Manaster & Selmi, Cal. Environmental Law & Land Use Practice (1992) § 21.05, pp. 21-16-21-18.) Plaintiff claims the EIR in this case is deficient because it only examined phase IA in detail and the balance of the project was analyzed "generally" and "lumped together with 68 other cumulative projects." ■■■ As noted above, in resolving this issue, this court's task is to determine whether there has been a prejudicial abuse of discretion caused by the city's failure to proceed in a manner required by law or if the determination is not supported by substantial evidence. (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 47 Cal.3d at pp. 392-393.) As defined in the Guidelines, substantial evidence means, after examination of the entire record, "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384.) Under this standard, we find no abuse of discretion in the approval and certification of the EIR on the phase IA project.

■■■ Focusing primarily on the circulation element, plaintiff concludes the city abused its discretion "by chopping a 5 million square foot integrated development project into pieces and examining only the first segment in

---

[6]Section 21065 defines project as: "(a) Activities directly undertaken by any public agency. [¶] (b) Activities undertaken by a person which are supported in whole or in part through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies. [¶] (c) Activities involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies."

[7]Guidelines section 15002, subdivision (d) defines the term project as: "[A]n activity subject to CEQA. The term 'project' has been interpreted to mean far more than the ordinary dictionary definition of the term. . . ." Guidelines section 15378 defines "project" in part as follows: "(a) . . . the whole of an action, which has a potential for resulting in a physical change in the environment, directly or ultimately . . . (c) . . . the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval."

detail."[8] According to plaintiff, the city had "no right" to proceed by using the staged EIR. It is true that, if proposed individual projects or phased single projects have a significant environmental impact, the lead agency must prepare a single EIR for the ultimate project. (Guidelines, § 15165;[9] *Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d at pp. 283-284.) However, it does not necessarily follow that the city lacked the authority to proceed with a staged EIR which is permissible under Guidelines section 15167, subdivision (a) which provides: "Where a large capital project will require a number of discretionary approvals from governmental agencies and one of the approvals will occur more than two years before construction will begin, a staged EIR may be prepared covering the entire project in a general form. The staged EIR shall evaluate the proposal in light of current and contemplated plans and produce an informed estimate of the environmental consequences of the entire project. The aspect of the project before the public agency for approval shall be discussed with a greater degree of specificity."

We conclude substantial evidence supports the city's approval and certification of the staged EIR in this case pursuant to Guidelines section 15167, subdivision (a). The Environmental Review Committee of the City of Los Angeles Planning Department determined it was appropriate to have a staged

---

[8]Plaintiff claims segmenting resulted in: (1) a traffic analysis which does not show the impacts caused by the phase IA project or the entire project; (2) a failure to analyze the traffic impacts and mitigation factors of 214 double-trailer dirt-hauling trucks; (3) an abstract description of the impact on future phases of the project; (4) an EIR which obscured the fact the build-out is not "a closely related project" but is the entire development itself which includes phase IA; (5) an absence of air quality evaluation from the master plan; (6) a failure to properly evaluate the shadows from 6 skyscrapers; and (7) the failure to consider the plans proposed in the CCW Specific Plan, e.g., changes to the Harbor Freeway have not been accomplished. Some of these issues were not raised below and, therefore, are not properly raised in this court. (*Coalition for Student Action* v. *City of Fullerton* (1984) 153 Cal.App.3d 1194, 1197-1198 [200 Cal.Rptr. 855].) Plaintiff also argues at great length the EIR fails to analyze the traffic impacts and mitigations associated with 214 double-trailer dirt-hauling trucks. However, the EIR is not deficient because it does not describe alternatives to excavation trucks because the statutes do not require alternatives to various facets of the project. (*Big Rock Mesas Property Owners Assn.* v. *Board of Supervisors* (1977) 73 Cal.App.3d 218, 226-227 [139 Cal.Rptr. 445].) Rather, the EIR must discuss proposed alternatives to the project as a whole which, as stated below, was done in this case. (*Ibid.*)

[9]Guidelines section 15165 provides: "Where individual projects are, or a phased project is, to be undertaken and where the total undertaking comprises a project with significant environmental effect, the lead agency shall prepare a single program EIR for the ultimate project as described in Section 15168. Where an individual project is a necessary precedent for action on a larger project, or commits the lead agency to a larger project, with significant environmental effect, an EIR must address itself to the scope of the larger project. Where one project is one of several similar projects of a public agency, but is not deemed a part of a larger undertaking or a larger project, the agency may prepare one EIR for all projects, or one for each project, but shall in either case comment upon the cumulative effect."

EIR because the project was multiphased and required a number of discretionary permits. The record shows the project was multiphased and would extend over more than two years. Phase IA of the master plan was the first of five total phases. Construction of the various phases was expected to span 11 to 12 years. The project itself was approved through the CCW Specific Plan, a process which began in 1987 and was adopted by the city council four years later in February of 1991. In accordance with the planning department's recommendations, the draft and final staged EIR's discussed the project in terms of earth (grading, drainage, geologic hazards, and seismic), air (quality, and stationary sources), animal life, noise, light/glare, circulation (transportation, access, and driveway), energy conservation, water conservation, service system (storm drainage, sewers, and solid waste disposal), aesthetics, public services (fire, police, and emergency), land use, "risk of upset/human health," jobs, and housing. The final EIR contained a section with responses to comments from various public and private agencies as well as individuals to the draft EIR including ALARM's comments. The staged EIR discussed the CCW Specific Plan generally and made specific comments about the proposed master plan and its impact on the environment throughout the report. The final EIR also included a list of ways in which the effects on the environment might be minimized as well as alternatives to the project. Therefore, contrary to plaintiff's contentions, the city did not impermissibly "chop" the project into segments and ignore the environmental consequences of the entire project by approving a staged EIR.

Plaintiff's argument is premised on the erroneous assumption the city did not comply with the standard set forth by our Supreme Court in *Laurel Heights Improvements Assn.* v. *Regents of University of California, supra,* 47 Cal.3d at p. 396.) In *Laurel Heights,* a neighborhood improvement association challenged a public university's approval of an EIR on the basis that it did not sufficiently address future expansions and activities of a building. The Supreme Court concluded: "[A]n EIR must include an analysis of the environmental effects of future expansion or other action, if: (1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects." (*Ibid.*) Where the future expansion or action is part of an overall plan for the project, the EIR should at least discuss the general effects of the reasonably foreseeable future uses of the land, the environmental effects of those uses, and the currently anticipated measures for mitigating those effects. (*Id.* at p. 398.) Plaintiff concludes the staged EIR in this case was deficient because, although the subsequent phases of the Los Angeles Center Master Plan were

reasonably foreseeable, the EIR only evaluated phase IA[10] and ignored the cumulative impacts of the entire project on the environment. An EIR must discuss significant cumulative impacts including "past, present, and reasonably anticipated future projects . . . ." (Guidelines, § 15130, subd. (b)(1)(A); *Las Virgenes Homeowners Federation, Inc.* v. *County of Los Angeles* (1986) 177 Cal.App.3d 300, 306 [223 Cal.Rptr. 18]; see also Guidelines, §§ 15065, 15082, 15122-15131.)

First, despite plaintiff's assertions to the contrary, *Laurel Heights* does not preclude the use of a staged EIR. Rather, the issue in *Laurel Heights* was whether the EIR was deficient given the absence of a discussion of the environmental effects of reasonably foreseeable proposed projects. Second, this case is distinguishable from *Laurel Heights* because the project approval was made with reference to the CCW Specific Plan and the master plan. Furthermore, consistent with the Guidelines on cumulative impact analysis, in addition to phase IA, the EIR included a consideration and discussion of proposed projects under environmental review. (*Schaeffer Land Trust* v. *San Jose City Council* (1989) 215 Cal.App.3d 612, 630 [263 Cal.Rptr. 813].) There are numerous references to the environmental consequences from the specific plan, the master plan, and the phase IA project. The draft EIR for the CCW Specific Plan included the proposed master plan. The draft and final EIR for the specific plan and the staged EIR contained extensive discussions about the environmental effects of the project and mitigation measures for transportation and circulation issues, as well as numerous other environmental factors. In approving the phase IA, the director of planning found that there would be a significant effect on circulation and transportation. The approval stated: "The Master Plan Project at full build-out could be expected to generate an estimated 41,750 trip ends per day (20,875 inbound and 20,875 outbound). During the PM peak hour, the Master Plan is expected to generate 1,091 inbound trips and 4,830 outbound trips. . . ." The director further noted that the draft and final EIR of the CCW Specific Plan extensively discussed the circulation and transportation issues. The discussions included in-depth studies of the environmental impacts of the particular intersections at issue in this case as well as the intersections within the CCW Specific Plan and various mitigation measures such as: street improvements (widenings, closures, and realignments), freeway and ramp improvements, transit improvements (the new metrorail station, high occupancy

---

[10]Plaintiff points to a number of factors which purport to establish that the future phases were reasonably foreseeable. They include: (1) the developer's purchase of replacement housing in preparation for development of phase IB, (2) the proposal of child care facilities to satisfy the requirements of build-out of the entire project, and (3) portions of the future phases such as 382 parking spaces for phase IB were actually approved and (4) permission to vacate subsurface street rights-of-way was obtained.

vehicle transitway, transportation demand management programs), and individual project-level analysis. The director also found: "Individual phases of the Master Plan Project will be required to implement a [Transportation Demand Management] program pursuant to the requirements of Section 9 of the Central City West Specific Plan, which is expected to reduce the number of trips generated by the Master Plan Project by 55%. The Master Plan Project developer will also be required to pay a Transportation Impact Mitigation Fee, presently set at $17,946, for each additional PM-peak hour trip generated by the Master Plan Project . . . . The Transportation Impact Mitigation Fee would be used to finance the transportation improvements listed in Appendix 'B' of the Central City West Specific Plan. These Transportation Improvements are expected to mitigate the transportation and circulation impacts of development in the Central City West Specific Plan area. A more specific analysis of the significant effects of the Master Plan Project and the improvement and mitigation measures necessary for Master Plan development will be studied when the conceptual plans have been finalized and will be subject to additional environmental evaluation. Potential mitigation measures for the Master Plan Project would be the same as those required for the Phase IA Project." Thus, the circulation and traffic issues and other environmental consequences of phase IA and the master plan were comprehensively and adequately discussed and evaluated by both public and private sources including ALARM. Moreover, the city's approval specified that the project and the remaining projects in the master plan would be subject to further environmental reviews. The EIR also contained detailed information about ways to minimize the significant effects and indicated alternatives to the project in accordance with the requirements of informing the public and its officials of the environmental consequences of the project. (§ 21061; *Citizens of Goleta Valley* v. *Board of Supervisors, supra*, 52 Cal.3d at p. 564.) We find no abuse of discretion in the agency's determinations.

Plaintiff appears to be laboring under the misconception that the identification of adverse environmental impacts is the equivalent of a legal mandate to refuse to approve and certify the EIR. For example, plaintiff goes to great lengths to magnify the claimed inadequacies of the EIR. Yet, ironically, the evidence upon which plaintiff seeks to support its claim of substantial adverse impacts on the environment is taken from the comprehensive CCW Specific Plan EIR and the staged EIR, both of which it argues are inadequate. Thus, plaintiff appears to want have it both ways, i.e., a reversal because the EIR is inadequate in that it does not identify the environmental consequences and a reversal because the EIR identifies too many adverse consequences. It cannot be overemphasized that this is neither the law nor the purpose of CEQA. ■ As our Supreme Court stated in *Laurel*

*Heights*: "A court may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. [Citation.] A court's task is not to weigh conflicting evidence and determine who has the better argument when the dispute is whether adverse effects have been mitigated or could be better mitigated. [Courts] have neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so. [A court's] limited function is consistent with the principle that '[t]he purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations.' [Citation.]" (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 47 Cal.3d at p. 393.) ■ Under these circumstances, the trial court judgment upholding the city's decision approving and certifying the EIR must be affirmed because it was an act authorized by law and is supported by substantial evidence. (*Id.* at pp. 392-393.)

### 2. *The Addendum*

The parties also dispute whether the city properly approved an additional 607,200 square feet with an addendum pursuant to Guidelines section 15164 as opposed to requiring a supplemental EIR pursuant to section 21166 and Guidelines section 15162. The Guidelines provide in pertinent part that a supplemental EIR is not required unless the subsequent changes are proposed in the project which "will require important revisions in the previous EIR . . . due to the involvement of new significant environmental impacts not covered in a previous EIR . . . ." (§ 15162, subd. (a)(1) & (2).) In *Fund For Environmental Defense* v. *County of Orange* (1988) 204 Cal.App.3d 1538, 1544 [252 Cal.Rptr. 79], the court held: "[A] subsequent or supplemental EIR is prepared under section 21166 only where it is necessary to explore the environmental ramifications of a substantial change not considered in the original EIR. [Citations.] . . . [¶] In deciding whether a public agency properly determined a subsequent or supplemental EIR was unnecessary, the standard of review is 'whether the record as a whole contains substantial evidence to support a determination that the changes in the project [or its circumstances] were not so "substantial" as to require "major" modifications to the EIR.' [Citations.]" ■ Plaintiff argues the additional square footage was a substantial change which required a separate EIR with notice or circulation for comment and response as required by Guidelines section 15162. (§ 21166.) The developer argues: "[T]he addendum did not revise, or relate to, the project at issue. Rather the addendum merely

provides updated information on the gross square footage of certain portions of the Los Angeles Center other than the first phase project." However, the trial court properly determined, as we do now, that plaintiff failed to exhaust its administrative remedies on the issue of the addendum because it was not raised in the pertinent administrative bodies during the EIR process. (§ 21177; *Coalition for Student Action* v. *City of Fullerton, supra,* 153 Cal.App.3d at pp. 1197-1198.) Accordingly, plaintiff cannot prevail on this issue.

### D. *Consistency With the General Plan*

Our Supreme Court has stated: "The Planning and Zoning Law of the State of California (Gov. Code, § 65000 et seq.) mandates the adoption of a general plan by every city and every county in this state ([Gov. Code] § 65300), provides that its adoption is a legislative act, and authorizes review by petition for writ of mandate pursuant to section 1085 of the Code of Civil Procedure. ([Gov. Code] § 65301.5.) [¶] A general plan must set out a statement of the city's development policies and objectives, and include specific elements among which are land use [housing] and circulation elements. ([Gov. Code] § 65302, subds. (a)[,] (b) & [(c)].) Once the city has adopted a general plan, all zoning ordinances must be consistent with that plan, and to be consistent must be 'compatible with the objectives, policies, general land uses, and programs specified in such a plan.' ([Gov. Code] § 65860, subd. (a)(ii).)" (*Lesher Communications, Inc.* v. *City of Walnut Creek* (1990) 52 Cal.3d 531, 535-536 [277 Cal.Rptr. 1, 802 P.2d 317], fns. omitted.) In this case, the city determined phase IA was consistent with its general plan.[11] In making that determination, the city had its general plan, the draft and final EIR for the CCW Specific Plan, the CCW Specific Plan, and the draft and final staged EIR for phase IA and extensive reports and

---

[11] Section 96.5 of the Los Angeles City Charter provides the city's general plan "shall be a comprehensive declaration of purposes, policies and programs for the development of the City, and shall include, where applicable, diagrams, maps and text setting forth objectives, principles, standards and other features." On April 3, 1974, the city council adopted as part of its general plan Concept Los Angeles and the Citywide Plan. Concept Los Angeles is a conceptual framework for the long range development of the city. The Citywide Plan was directed to a 20-year intermediate range and furnished the "basis for the preparation and revision of other more detailed parts of the General Plan, the community plans and the technical elements for the City's circulation, public service-systems and environmental quality." Section 96.5(2) of the Los Angeles City Charter provides that the general plan shall include a land use element, a circulation element, a service-systems element, an environmental, and other elements including those enumerated by state law. The general plan and its elements are contained in three volumes: volume I which contains concept of the general plan and the city plan; volume II which contains individual technical elements for various subcategories of the service systems, circulation and environmental elements; and volume III which "contains area, community and district plans, for various sub-areas of the City, which

comments from ALARM, public agencies and others concerning the environmental effects of the project. ■ The "[q]uasi-legislative actions of a city must be upheld unless [they are] arbitrary, capricious, or without evidentiary basis." (*A Local & Regional Monitor* v. *City of Los Angeles, supra,* 12 Cal.App.4th at p. 1794; *Buena Vista Gardens Apartments Assn.* v. *City of San Diego Planning Dept.* (1985) 175 Cal.App.3d 289, 298 [220 Cal.Rptr. 732].) A city's findings that the project is consistent with its general plan can be reversed only if it is based on evidence from which no reasonable person could have reached the same conclusion. (*No Oil, Inc.* v. *City of Los Angeles* (1987) 196 Cal.App.3d 223, 243 [242 Cal.Rptr. 37].)

■ Plaintiff argues that the project EIR is inconsistent with the city's general plan because the general plan is allegedly legally inadequate in that it lacks the necessary circulation, land use, and housing elements. However, plaintiff is really using the phase IA project as a vehicle to make an untimely collateral attack on the city's general plan itself. Plaintiff cannot prevail on any of these issues in this appeal. First, plaintiff did not raise the issues of the adequacy of the general plan and the housing and land-use elements in the trial court but limited its argument to the circulation element. Plaintiff cannot raise the issues for the first time in the appellate court. (*Richmond* v. *Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 874 [242 Cal.Rptr. 184].) Second, to the extent that plaintiff's arguments are a thinly veiled challenge to the claimed inadequacy of the city's circulation, housing, and land-use elements, they are also time-barred by Government Code section 65009, subdivision (c) which provides in part: "Except as provided in subdivision (d), no action or proceeding shall be maintained in any of the following cases by any person unless the action or proceeding is commenced and service is made on the legislative body within 120 days after the legislative body's decision: [¶] (1) To attack, review, set aside, void, or annul the decision of a legislative body to adopt or amend a general or specific plan. This paragraph does not apply where an action is brought based upon the complete absence of a general plan or a mandatory element thereof, but does apply to an action attacking a general plan or mandatory element thereof on the basis that it is inadequate." Government Code section 65009, subdivision (a)(3) provides: "The purpose of this section is to provide certainty for property owners and local governments regarding decisions made pursuant to this division." The administrative record establishes the circulation and land-use elements were initially adopted in 1974 and were amended most recently in February 1991. This action was not filed until January 13, 1992, well over 120 days after the general plan was adopted in 1974 and the most

---

present the Land Use Element in detail appropriate to routine reference in connection with zone changes, conditional uses, public facility locations and other planning matters."

recent amendment in February 1991 and is therefore barred by Government Code section 65009, subdivision (c). (*Garat* v. *City of Riverside* (1991) 2 Cal.App.4th 259, 287-290 [3 Cal.Rptr.2d 504].) Likewise, plaintiff's claim that the city's general plan is inadequate because it failed to properly correlate its circulation, housing, and land-use elements (Gov. Code, § 65302, subd. (b)), is also time-barred. (*A Local & Regional Monitor* v. *City of Los Angeles, supra,* 12 Cal.App.4th at p. 1816.)[12]

## IV. Disposition

The judgment is affirmed. The City of Los Angeles, its city council, council members, its planning commission, and commission members, as well as UC Land Associates and Unocal Corporation, shall each separately recover their costs from A Local and Regional Monitor, a California non-profit corporation.

Grignon, J., and Armstrong, J., concurred.

A petition for a rehearing was denied July 2, 1993, and appellant's petition for review by the Supreme Court was denied September 16, 1993.

---

[12]Because we determine the attacks on the general plan are barred by the statute of limitations, we need not address the respondents' claims that pursuant to *Resource Defense Fund* v. *County of Santa Cruz* (1982) 133 Cal.App.3d 800, 809 [184 Cal.Rptr. 371], and *Holt* v. *County of Monterey* (1982) 128 Cal.App.3d 797, 801 [180 Cal.Rptr. 514], the doctrine of laches bars any attacks on the general plan which was adopted in 1974 and as amended in February 1991.