Filed 3/4/15  P. v. Bradford CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064873 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN313589-4) |
| MICHAEL BRADFORD, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kimberlee A. Lagotta, Judge.  Affirmed.

Patrick Morgan Ford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury convicted Michael Bradford of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)) and robbery (Pen. Code, § 211).[1] The jury also found true allegations Bradford committed these crimes for the benefit of, at the direction of, or in association with a criminal street gang (Pen. Code, § 186.22, subd. (b)(1).) The trial court sentenced Bradford to 15 years in state prison.

Bradford appeals, contending we must reverse his conviction because the trial court prejudicially erred by failing to exclude his statements to police detectives and certain gang expert testimony. He additionally contends there was insufficient evidence to support his conviction for assault with a deadly weapon under the natural and probable consequences doctrine, and the accumulation of the trial court's errors deprived him of a fair trial. We are not persuaded by Bradford's contentions and affirm the judgment.

BACKGROUND

Bradford, James Williams, and Dorian Larkin attacked an 18-year-old man, robbed him of his backpack and cell phone, and then fled in a car driven by Bradford.[2] During the robbery, the victim resisted and Williams stabbed him multiple times, including once in his left shoulder, once in his left chest, and once in his right abdomen below his ribcage. The latter wound lacerated the right ventricle of the victim's heart.

_____

[1] The jury could not reach a verdict on a charge for attempted murder (Pen. Code, §§ 187, subd. (a), 664).

[2] Williams pleaded guilty to attempted murder and to robbery. He also admitted the truth of a gang enhancement allegation. Larkin pleaded guilty to attempted murder.

Within an hour of the stabbing, uniformed gang suppression officers encountered Williams, Larkin, and a juvenile at a nearby home improvement store. One of the officers patted down the men and found folding knives in Larkin's and the juvenile's possession. A week after the stabbing a field evidence technician also found a folding knife in a pocket behind the driver's seat of the car Bradford drove.

Police detectives subsequently located the victim's backpack in a dumpster at the end of a dead-end road not far from the home improvement store. A district attorney's office investigator located a folding knife, with its blade extended, in vegetation in the same area. The knife was consistent with the type of knife that could have inflicted the victim's abdomen injury.

Bradford told Detective Douglas Baxter he happened upon Williams, Larkin, and the juvenile after the trio decided to rob a pedestrian. He reluctantly agreed to act as their getaway driver. Neither he nor the juvenile participated in the robbery itself, although he got out of the car to yell at Williams and Larkin to hurry up. As the group fled the scene, Williams admitted stabbing the victim and threw the knife out of the car window. Bradford denied advanced knowledge Williams was carrying a knife.

Bradford, Williams, and Larkin were all members of the East Side Crook Mobsters Crip gang (gang). The officer who contacted Williams, Larkin and the juvenile at the home improvement store testified gang members commonly carry concealed weapons, particularly folding knives. Detective Ryan Davis, the prosecution's gang expert, also testified gang members commonly carry weapons, primarily for protection.

Detective Davis additionally testified gang members who go out in squads to commit robberies are commonly armed to ensure their success. Consequently, resistance from a victim is typically met with a violent assault.

Detective Davis further testified it is important for every member of the robbery squad to know who is carrying weapons. This was particularly true for the getaway driver because the getaway driver is generally in charge. Moreover, because bringing a weapon into a car puts the driver at risk, it would be viewed as disrespectful not to inform the driver of the weapon.

In response to hypothetical questions mirroring the evidence in this case, Detective Davis opined the robbery was committed in association with the gang and benefited both the gang and the gang's members. In addition, he opined the gang members involved in the robbery would know whether an accomplice was armed. He also opined it was foreseeable the victim might try to resist and one of the gang members might try to injure or kill the victim.

DISCUSSION

I

*Admission of Police Interview*

A

1

Approximately a month after the incident, Detectives Baxter and Davis interviewed Bradford.[3]  A patrol officer, whom Bradford knew from prior contacts, was present during the interview.  Before the interview commenced, the patrol officer collected Bradford's property and engaged in small talk with him.  They talked about the weather, Bradford's work, and Bradford's friends and family.[4]  Bradford asked whether the collection of his property meant he was going to jail and the patrol officer explained it was a routine procedure.[5]

Once the interview commenced, Detective Baxter immediately informed Bradford he was under arrest and provided him with the advisements required by *Miranda v. Arizona* (1966) 384 U.S. 436, 478.  After listening to and confirming his understanding

---

[3]    The prosecution played a video recording of the interview for the jury.

[4]    The patrol officer also engaged in small talk with Bradford during breaks in the interview.

[5]    Although not reflected in the interview, the patrol officer arrested Bradford in connection with the investigation of an attempted murder and an assault with a deadly weapon before transporting him to the police station for the interview.

5

the advisements, Bradford agreed to speak with the detective. Bradford initially denied having anything to do with the stabbing and offered alibis for the relevant time period.

Detective Baxter summarized the incident, summarized some of what Bradford's accomplices had said about the incident, told Bradford his accomplices were blaming him, and warned him, "If you don't tell me the truth what these dudes said is gonna get you in the same boat as them and these guys are in f—ing serious trouble."

Bradford asked, "I'm going to jail?" Detective Baxter responded, "Yeah, jail is like the least you have to worry about, prison, okay?" Bradford clarified, "You're saying tonight I'm going to jail." Baxter responded, "Yeah, if you don't tell me what happened you are and tell me the truth."

After Detective Baxter continued to implore Bradford to tell the truth, Bradford admitted he was driving his sister's car when he came upon Williams, Larkin, and the juvenile.[6] The trio told him they were trying to rob somebody.

Detective Baxter interjected and encouraged Bradford to continue telling the truth. Bradford said, "I just don't wanna go to jail for nothing." Baxter responded, "You're not gonna go to jail for what they did I'm telling ya, just tell me the truth." Bradford lamented further, "I know basically I'm gonna go to jail." Baxter responded, "I don't know but you gotta tell me but I gotta tell you one thing if you tell me the truth about

---

[6] While Detective Baxter was imploring Bradford to tell the truth, and in the context of explaining why Bradford's brother decided not to lie for Bradford, Baxter mistakenly described the incident as a "capital offense." However, there was no other suggestion during the interview Bradford was facing capital charges, nor was there any apparent perception by Bradford he was facing such charges.

what happened as I know it you're not in anywhere near the amount of trouble they are but you have to tell me what you did . . . ."

Bradford continued his narrative, stating his accomplices told him who they were planning on robbing and, applying peer pressure, they persuaded him to be the getaway driver. He said he stayed in the car until they returned and then dropped them off at Larkin's girlfriend's house, and then went to his own sister's house. The juvenile called him later and told him it was a "burnt mission," meaning they did not get anything from the robbery. The juvenile also told him Williams had stabbed someone during the robbery. Bradford said he left for Nevada a few days later.

Detective Baxter questioned the veracity of Bradford's claim he stayed in the car the whole time because it was inconsistent with his accomplices' statements and eyewitness accounts. Baxter then implored Bradford once again to tell the truth, implying Bradford's accomplices had named Bradford as the person who actually stabbed the victim. Baxter also told Bradford, "[I]f you don't tell me who actually stabbed this kid, you're gonna be in the same boat as everybody else."

However, Bradford remarked he was "basically already in the same boat as everybody else" because they were blaming the incident on him. Detective Baxter continued to press him, advising him to tell the truth so he did not "go down for stabbing somebody if [he] didn't do it." Bradford pointed out he was "gonna go down regardless either, either way for something else." Baxter agreed Bradford was in trouble if Bradford was involved in the stabbing; however, Baxter asserted there was "a gigantic difference"

7

between being the stabber and being one of the other participants and implied the stabber would be in more trouble.  Baxter also insisted he was the only one who believed Bradford was not the stabber, Bradford's friends "did [him] no good in this case," and Bradford needed to stand up for and help himself by telling the truth.

Bradford agreed.  He explained Larkin and Williams accosted the victim and, as they tussled with him, Williams stabbed him.  He denied being involved in the tussle.  He said he got out of the car and yelled at them to "come on 'cause they was taking too long."  The victim finally let go of his backpack and they left.  He dropped off Williams, Larkin, and the juvenile at an apartment complex and then went home himself.  Williams threw the knife out of the car window along the way.

After Bradford finished this account, Detective Baxter reiterated, "[Y]ou get involved in something like this like I said earlier I can't say you're not in trouble, you are but don't you see the tremendous difference between somebody who stabbed somebody over nothing as compared to somebody who's yelling come on, come on let's get out of here?  . . .  [¶] . . . [¶] It's a big difference, right?  You get arrested but in the end there's a trial, there's court, the lawyers talk to each other what are we gonna do, let's shake this all together what comes out at the end?"

Detective Baxter clarified a few points with Bradford and then told him, "Okay, um, like I said you're gonna have to go to jail tonight the uh regardless of what we [talked] about tonight the district attorney's office wants you arrested from what your best friends said about you, okay and running away didn't help."  In addition Baxter explained,

8

"[I]n the end I don't know really what's gonna happen about this but we did clear up that you did not stab somebody, okay?  That's really, really important super important, right?"

Bradford asked what he was being charged with and Baxter responded, "Right now conspiracy and conspiracy for robbery and conspiracy for attempted murder."  However, Baxter explained the charges could change depending on other factors.

The interview paused while Bradford took Detective Baxter and the patrol officer to the area where he thought Williams discarded the knife.  When the interview resumed, Detective Davis took over and asked Bradford questions about Bradford's gang involvement.  Bradford said he had been a member of the gang for about three years and his moniker was Little Savage.  Williams, Larkin, and the juvenile were also members of the gang.

Bradford showed Detective Davis the gang's hand sign and provided him with background information about the gang, including the gang's territory, colors, name, membership, history, structure, activities, and rivals.  Bradford admitted he had to and did "put in work" for the gang to make a name for himself.

After the interview concluded, but while he was still being recorded, Bradford used his cell phone to call someone.  Bradford informed the person he was going to jail.  He also informed the person of the charges he was facing and that, if found guilty, he could be facing a 10- or 15-year sentence.

Before trial, Bradford moved to exclude any statements he made during the interview, arguing the statements were the involuntary product of implied promises of leniency. The trial court viewed the video recording of the interview and heard the parties' arguments. The court determined from the totality of the circumstances Detective Baxter's comments during the interview did not amount to implied promises of leniency and Bradford's statements were voluntary.

## B

" 'An involuntary confession is inadmissible under the due process clauses of both the Fourteenth Amendment to the federal Constitution [citation] as well as article I, sections 7 and 15 of the California Constitution [citation].' [Citation.] 'Under both state and federal law, courts apply a "totality of circumstances" test to determine the voluntariness of a confession.' [Citation.] '[C]oercive police activity is a necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment.' [Citation.] '[T]he question in each case is whether the defendant's will was overborne at the time he confessed. [Citations.] If so, the confession cannot be deemed "the product of a rational intellect and a free will." ' [Citation.] The burden is on the prosecution to show by a preponderance of the evidence that the statement was voluntary. [Citation.] 'When, as here, the interview was tape-recorded, the facts surrounding the giving of the statement are undisputed, and the

appellate court may independently review the trial court's determination of voluntariness.' " (*People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1400-1401.)

"In evaluating the voluntariness of a statement, no single factor is dispositive. [Citation.] The question is whether the statement is the product of an ' "essentially free and unconstrained choice" ' or whether the defendant's ' "will has been overborne and his capacity for self-determination critically impaired" ' by coercion. [Citation.] Relevant considerations are ' "the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity" as well as "the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health." ' " (*People v. Williams* (2010) 49 Cal.4th 405, 436.)

" 'In assessing allegedly coercive police tactics, "[t]he courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable." ' " (*People v. Williams*, *supra*, 49 Cal.4th at p. 436.) "It is well settled that law enforcement may confront a witness with what they know. [Citation.] They may also discuss any advantages that ' "naturally accrue" ' from making a truthful statement. [Citations.] They may explain the possible consequences of the failure to cooperate as long as their explanation does not amount to a threat contingent upon the witness changing her story. [Citations.] They may even engage in deception as long as it is not of a type 'reasonably likely to produce an untrue statement.' " (*People v. Quiroz* (2013) 215 Cal.App.4th 65, 79.)

In this case, Bradford points to two tactics he contends caused his statements to be involuntarily coerced. First, he contends the patrol officer impermissibly engaged in ingratiating small talk to soften him up before Detective Baxter provided him with the *Miranda* advisements and, thereby, reduced the impact of the advisements. Second, he contends Detective Baxter impermissibly implied he would be treated more leniently if he confessed.

Regarding the first contention, the Supreme Court has held a waiver of *Miranda* rights is involuntary if it " 'result[ed] from a clever softening-up of a defendant through disparagement of the victim and ingratiating conversation.' " (*People v. Gurule* (2002) 28 Cal.4th 557, 602, citing *People v. Honeycutt* (1977) 20 Cal.3d 150, 160-161.) Nonetheless, the Supreme Court has also held this rule does not apply where, as here, the police do not discuss the victim and there is no other evidence the small talk overbore the defendant's free will. (*People v. Gurule*, *supra*, at p. 602; *People v. Scott* (2011) 52 Cal.4th 452, 478.)

Regarding the second contention, the Supreme Court in *People v. Holloway* (2004) 33 Cal.4th 96, addressed whether "suggestions that defendant would benefit from giving a truthful, mitigated version of the crimes . . . constituted implied threats and promises of leniency sufficient to render the subsequent admissions involuntary." (*Id.* at p. 115.) The Court concluded that, as occurred here, "suggesting that defendant might benefit in an unspecified manner from giving a truthful, mitigated account of events" does not cross the fine line between permissibly "factually outlining the benefits that may

12

flow from confessing" and impermissibly "impliedly promising lenient treatment in exchange for a confession." (*Id.* at p. 117.) Accordingly, we conclude Bradford has not established the trial court prejudicially erred in denying his motion to exclude his statements to police detectives.

II

*Admission of Bradford's Remarks About Prior Crimes and Custody*

A

After the court denied Bradford's motion to exclude his statements to police detectives, Bradford moved under Evidence Code section 352 to exclude specific remarks he made during the interview about prior crimes and custody, including that he was "locked up," "got out of jail," "got out of jail in August," "did a burglary before," "got caught for [his] burglary," and "robbed a few houses and got caught." Bradford argued the admission of these remarks would cause the jury to improperly perceive him to be a repeat offender and prevent the jury from independently analyzing the charged crimes.

Conversely, the People argued the remarks were relevant to the gang enhancement allegations because the remarks tended to prove Bradford's gang involvement and the gang's primary activities. The People also argued the remarks showed Bradford was criminally sophisticated and were, therefore, relevant to his credibility and whether he was culpable for any crimes under the natural and probable consequences doctrine. The People suggested the court give a limiting instruction directing the jury not to infer Bradford's guilt simply because he had committed crimes in the past.

13

The trial court found the remarks admissible under Evidence Code section 352, noting Bradford volunteered the remarks to provide context for his statements mitigating or distinguishing his conduct from his accomplice's conduct and they were relevant to the gang enhancement allegations. To reduce the remarks' potential prejudice, the court instructed the jury, "You have heard evidence of statements made by Mr. Bradford to Detectives Baxter and Davis regarding prior criminal conduct that Mr. Bradford has engaged in, gang affiliation or gang membership, and references to Mr. Bradford having previously been incarcerated. You must not conclude from this evidence that Mr. Bradford is a bad person, has a bad character, or has a disposition to commit crimes."

### B

Evidence Code section 352 permits a court to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." " 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues. In applying [Evidence Code] section 352, "prejudicial" is not synonymous with damaging.' " (*People v. Bolin* (1998) 18 Cal.4th 297, 320.)

A trial court has broad discretion to determine both the relevance of evidence and whether its prejudicial effect outweighs its probative value. (*People v. Jones* (2011) 51 Cal.4th 345, 373.) " 'A trial court's exercise of discretion in admitting or rejecting evidence pursuant to Evidence Code section 352 "will not be disturbed on appeal unless there is a manifest abuse of that discretion resulting in a miscarriage of justice." ' " (*People v. Thomas* (2011) 51 Cal.4th 449, 485; accord, *People v. Scott*, *supra*, 52 Cal.4th at p. 491.)

Here, Bradford made nearly all of the challenged remarks during his interview with Detective Davis. As the trial court noted, the remarks were volunteered, not elicited, and Bradford made them in the context of minimizing his involvement in the stabbing and distinguishing himself from the other gang members. Considered in their context, the remarks had direct bearing on whether the gang was a criminal street gang, whether Bradford was affiliated with and actively participated in the gang, and whether Bradford could reasonably foresee an assault on the victim with a deadly weapon was a natural and probable consequence of the robbery of the victim. While the remarks were potentially prejudicial, the trial court mitigated the prejudice with its limiting instruction, which we presume the jury followed. (*People v. Adams* (2014) 60 Cal.4th 541, 578.) Consequently, Bradford has not established the trial court manifestly abused its discretion in determining the remarks were not substantially more prejudicial than probative.

III

*Admission of Gang Expert Evidence*

A

Before trial, Bradford moved to exclude any gang expert testimony opining a gang member in general and a getaway driver in particular knows when a cohort is armed. The trial court denied the motion, finding the testimony was proper and relevant.

B

We review a trial court's decision to admit expert testimony for abuse of discretion. The trial court's exercise of its discretion "is not grounds for reversal unless ' "the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Ochoa* (2001) 26 Cal.4th 398, 437-438, abrogated on another ground in *People v. Prieto* (2003) 30 Cal.4th 226, 263, fn. 14.)

If relevant to a case, a gang expert may testify about the culture and habits of criminal street gangs. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 944 (*Gonzalez*).) The gang expert may also give opinions in response to hypothetical questions mirroring the evidence in a case. (*Id.* at p. 946; *People v. Xue Vang* (2011) 52 Cal.4th 1038, 1045.) Such opinions may encompass whether a gang member would know whether a fellow gang member was armed because such information is " ' "sufficiently beyond common experience that the opinion of the expert would assist the trier of fact." ' " (*Gonzalez*, *supra*, at p. 944.) Contrary to Bradford's assertions, *People v. Killebrew* (2002) 103

16

Cal.App.4th 644 (*Killebrew*) does not bar such opinions because the Supreme Court expressly "disapprove[d] of any interpretation of *Killebrew* . . . as barring, or even limiting, the use of hypothetical questions.  Even if expert testimony regarding the defendants themselves is improper, the use of hypothetical questions is proper."  (*People v. Xue Vang*, *supra*, at p. 1048, fn. 3.)  As the gang expert in this case testified in response to hypothetical questions, and not about whether Bradford himself knew Williams was armed, the gang expert's testimony was proper and the trial court did not abuse its discretion by declining to exclude it.

IV

*Sufficiency of Evidence to Support Conviction for Assault with a Deadly Weapon*

Bradford contends there was insufficient evidence to support his conviction for assault with a deadly weapon under the natural and probable consequences doctrine.  In evaluating a sufficiency of the evidence claim, " 'we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt.  [Citation.]  The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.  [Citation.] "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the

17

reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]" [Citation.] A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

"The natural and probable consequences doctrine is based on the recognition that those who aid and abet should be responsible for the harm they have naturally, probably, and foreseeably put in motion." (*People v. Avila* (2006) 38 Cal.4th 491, 567.) Under the doctrine, " '[a] person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime. The latter question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable. [Citation.]' [Citation.] Liability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' " (*People v. Medina* (2009) 46 Cal.4th 913, 920.) " '[T]o be

18

reasonably foreseeable "[t]he consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough." ' " (*Ibid.*)

Here, the evidence viewed most favorably to the judgment showed Bradford aided and abetted a strong-arm robbery. The evidence also showed: (1) robbery victims will sometimes resist; (2) Bradford and his accomplices were gang members, (3) gang members commonly carry weapons, particularly folding knives, to protect themselves and ensure successful endeavors; and (4) gang members, particularly getaway drivers, will know whether anyone in their group is armed. This evidence was bolstered by the discovery of knives in the getaway car and in the possession of Larkin and the juvenile. Under such circumstances, a reasonable person in Bradford's position would have or should have known the commission of an assault with a deadly weapon was a reasonably foreseeable consequence of the commission of the robbery he aided and abetted. As the applicable test is an objective one rather than a subjective one, whether Bradford actually knew Williams had a weapon is immaterial. (*People v. Montes* (1999) 74 Cal.App.4th 1050, 1056.) Therefore, Bradford has not established there was insufficient evidence to support his conviction for assault with a deadly weapon under the natural and probable consequences doctrine.

V

*Cumulative Impact of Claimed Errors*

Bradford contends the cumulative impact of the above trial court errors deprived him of his federal and state constitutional due process right to a fair trial. Because we have rejected his other claims of error, we must necessarily reject this contention as well. (*People v. Williams* (2013) 58 Cal.4th 197, 291.)

DISPOSITION

The judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:

O'ROURKE, J.

AARON, J.

20