Filed 7/31/17 Certified for Partial Publication 8/24/17 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE HIGHWAY 68 COALITION, | H042891 |
| Plaintiff and Appellant, | (Monterey County Super. Ct. No. M116436) |
| v. | |
| COUNTY OF MONTEREY et al., | |
| Defendants and Respondents; | |
| OMNI RESOURCES LLC, | |
| Real Party in Interest and Respondent. | |

## I.  INTRODUCTION

This CEQA[1] case arises from the proposal of respondent Omni Resources LLC (Omni) to build a shopping center on Highway 68 in respondent Monterey County (County).  After preparing an environmental impact report (EIR) concerning the proposed project and considering public comments, County's Board of Supervisors approved the project in 2012.

---

[1] California Environmental Quality Act, Public Resources Code section 21000, et seq.  All further statutory references are to the Public Resources Code unless otherwise indicated.

Appellant The Highway 68 Coalition (Highway 68), self-described as "a long-standing organization of community members," challenged the approval of Omni's shopping center project by filing a petition for writ of mandate alleging violations of CEQA's requirements for environmental review. The trial court denied the petition as to the claimed CEQA violations, but issued an order of interlocutory remand to allow the County to clarify an issue of whether the project was consistent with the County's general plan requirement that the project have a long-term, sustainable water supply. On remand, the Board of Supervisors clarified that the project "has a long-term sustainable water supply, both in quality and quantity to serve the development in accordance with the 2010 Monterey County General Plan Policies PS-3.1 and PS-3.2 and is therefore consistent with Policies PS- 3.1 and PS-3.2." The trial court subsequently denied Highway 68's writ petition and entered judgment in favor of the County and Omni on July 27, 2015.

On appeal, Highway 68 contends that the trial court erred in denying its petition for writ of mandate for several reasons: (1) the trial court erred in issuing an interlocutory remand; (2) the County violated Highway 68's right to procedural due process on interlocutory remand; (3) the County violated CEQA because the water supply analysis was inadequate, the analysis of the project's consistency with the County's general plan was inadequate, the EIR's traffic analysis was inadequate, and environmental review of Omni's project was improperly segmented.

For reasons that we will explain, we find no merit in appellants' contentions and therefore we will affirm the judgment

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Omni's Proposed Project*

Omni, the landowner and project developer, sought County approval for construction of a shopping center on 11 acres located at the intersection of Highway 68 and Corral de Tierra Road in Monterey County. As proposed in 2010, the shopping

2

center would be built on property zoned commercial, and would consist of 10 retail buildings, including a grocery store, a two-story office building, and other retail spaces for a sporting goods store, bank, florist, mail store, post office branch, or a barber/beauty salon, plus a day care center, small restaurants, and parking spaces.

**B.** *The Draft Environmental Impact Report*

In May 2010 the County circulated for review the draft environmental impact report (DEIR) for Omni's project, the "Corral de Tierra Neighborhood Retail Village," pursuant to the requirements of CEQA.

The DEIR stated that four alternatives were considered for the project, including (1) a "No Project Alternative;" (2) the "LEED[2] Silver: Reduced Water Consumption/ Full Recharge Alternative;" (3) the "Reduced Density/Redesigned Project Alternative;" and (4) the "Alternative Project Location." The "Reduced Density/Redesigned Project Alternative" was identified as the environmentally superior alternative.

The many environmental impacts addressed in the DEIR included the impacts on the water supply and traffic. The DEIR stated that the Reduced Density/Redesigned Project Alternative would incorporate a storm water retention/percolation system to capture runoff from three areas: the project site, the surface area of the adjacent service station site, and the adjacent hillside. This alternative would reduce water consumption due to reduced building square footage and the use of LEED equivalent fixtures and landscaping. Based on the reports of Whitson Engineers, the DEIR stated that implementation of the Reduced Density/Redesigned Project Alternative would result in recharge of the groundwater basin and potentially no significant impact to groundwater resources.

---

**2** LEED is an acronym for Leadership in Energy and Environmental Design. (https://www.usgbc.org/leed.)

Regarding traffic impacts, the DEIR included an analysis of the project's impacts on vehicle traffic at several Highway 68 intersections in the vicinity of the project. The DEIR stated that the project would have significant unavoidable impacts on two intersections, including the intersection of Highway 68 and Corral de Tierra Road, despite the proposed mitigation measures.

## C. *The County's Approval of Omni's Project and Final EIR*

Several public hearings regarding the project were held before the County's Board of Supervisors in 2011 and 2012. During that time, the project was redesigned by County staff and Omni to address the Board of Supervisor's concerns, which included reducing the size of the shopping center. There was also an investigation of the evidence of soil and water contamination from the removal of underground gas tanks in an adjacent parcel.

On February 7, 2012, the Board of Supervisors adopted Resolution No. 12-039, which certified the final EIR (FEIR) and adopted a statement of overriding considerations. The resolution states that "[t]ogether, the DEIR and the Responses to Comments constitute the final EIR on the project."

The Board of Supervisor's findings, as stated in Resolution No. 12-039, for certifying the FEIR and adopting a statement of overriding considerations included the following description of the project: "The project which the County is considering for approval concurrently with Certification of the EIR is [Omni's] proposed reduced density 99,970 square foot alternative which is similar to the reduced density alternative . . . . The 99,970 square foot alternative presented by the applicant is the environmentally superior alternative because as a variant of the reduced density alternative it also includes a reduction in building area and mass, a corresponding reduction in traffic and increases the landscape buffers along the street frontages of the site."

Resolution No. 12-039 also included the following findings regarding water impacts: "Potentially significant impacts on ground water have been mitigated to a less

4

than significant level through the redesigned 99,970 square foot retail center including a storm water collection and groundwater recharge system proposed by the applicant and approved by the Board of Supervisors. This design will result in a net water balance for operation of the retail village at this location." As to traffic impacts, the Board of Supervisor's findings stated, among other things, that the DEIR had found that the project would have direct impacts on traffic that could not be mitigated to a less than significant level.

On February 7, 2012, the Board of Supervisors adopted a second resolution concerning Omni's project, Resolution No. 12-240, which approved the combined development permit and general development plan for the project. Resolution No. 12-240 included the Board of Supervisor's findings that the project, as conditioned, was consistent with the 2010 Monterey County General Plan, the Toro Area Plan, and the Monterey County Zoning Ordinance.

Among other findings included in Resolution No. 12-240, the Board of Supervisors stated that "[t]he project has an adequate long-term water supply and manages development in the area so as to minimize adverse effects on the aquifers and preserve them as viable sources of water for human consumption." The Board of Supervisors further found that "[t]he existing groundwater basin in the El Toro area is in overdraft and this has resulted in the placement of the 'B-8' Zoning Overlay District in an area of the Toro Area Plan including the project site. The project would use a maximum of 9.0 acre-feet per year (AFY) of water and the underground water recharge system approved for the 99,970 square foot project would return 9.66 AFY of water to the underground basin which results in a net positive water balance . . . [¶] . . . [¶] provided that the development can be found to not adversely affect the constraints which caused the 'B-8' District to be applied to the property."

5

**D.** *The Petition for Writ of Mandate*

In March 2012, Highway 68 filed a petition for writ of mandate challenging the County's approval of Omni's shopping center project on the ground that County had failed to comply with CEQA. Highway 68 sought a writ of mandate directing the County and the Board of Supervisors to set aside their February 7, 2012 approvals of the project and to prepare and circulate a legally adequate EIR in any subsequent action to approve the project.

Highway 68 alleged that the specific CEQA violations included (1) the EIR failed to analyze the water rights for the project; (2) the project's "recharge scheme" to "capture stormwater runoff from the project site and put it in underground chambers" was uncertain without measurement of the amount of groundwater recharge; (3) the EIR failed to investigate the traffic impacts on segments of Highway 68 that were already at the lowest level of service; (4) the EIR failed to adequately address the project's impact on greenhouse gases; (5) the environmental review was improperly piecemealed because the adjacent gas station was not included; and (6) the EIR did not adequately address the impacts on sewage capacity.

In addition, Highway 68 asserted that the project was inconsistent with the 2010 General Plan because Policy PS-3.2 requires projects to have a long term sustainable water supply. Highway 68 also asserted that the project was inconsistent with the Toro Area Plan because a parking lot was placed in the required 100-foot setback.

**E.** *Intended Decision and Interlocutory Remand*

After the trial court heard argument on Highway 68's writ petition and issued an intended decision, objections to the intended decision were filed and in June 2014 the court heard further argument. On July 29, 2014, the trial court entered an order of interlocutory remand that included the court's rulings on Highway 68's claims of CEQA violations. The trial court rejected Highway 68's claims of CEQA violations, but

6

determined that an interlocutory remand was appropriate with regard to an issue of general plan consistency.

The trial court's determination that an interlocutory remand should issue arose from the court's finding that Policy PS-3.1 of the County's 2010 general plan requires "a 'specific finding and supporting evidence' of a *long-term sustainable water supply* based on the PS-3.2 criteria." (Italics added.) The court further found that County had approved the project based on a finding in Resolution 12-240 with different language: " 'The Project has an *adequate long-term water supply* and manages development in the area so as to minimize adverse effects on the aquifers and preserves them as viable sources of water for human consumption.['] " (Italics added.) The court noted that the 2010 general plan defines "long term sustainable water supply" as "a water supply . . . that can provide for current and projected future demand for water from the source as determined pursuant to the criteria required to be adopted by Policy PS-3.2."

Based on these provisions of the 2010 general plan and the trial court's findings that substantial evidence supported the County's findings and conclusions regarding water (including the water balance analysis, the water demand analysis,, and the recharge analysis), the court ruled that "the County is required to determine whether or not there is a Long Term Sustainable Water Supply. The failure to make this determination was an abuse of discretion."

Due to the trial court's finding of an abuse of discretion, the court stayed its July 29, 2014 intended decision and issued an interlocutory remand "so the Board of Supervisors can decide whether or not there is a Long Term Sustainable Water Supply." The court relied on the decision in *Voices of the Wetlands v. State Water Resources Control Bd.* (2011) 52 Cal.4th 499 (*Voices of the Wetlands*) as authority for the interlocutory remand procedure.

The Board held a hearing on remand on December 16, 2014.[3]  After a presentation by the County's planning department and presentations by counsel for Omni and Highway 68, the Board of Supervisors adopted Resolution No. 14-360 and clarified that the project "has a long-term sustainable water supply, both in quality and quantity to serve the development in accordance with the 2010 Monterey County General Plan Policies PS-3.1 and PS-3.2 and is therefore consistent with Policies PS- 3.1 and PS-3.2." The Board of Supervisors also stated in Resolution No. 14-360 that "[t]he Board's 2012 findings in support of approving the project implied that the project has a long term sustainable water supply and were based on substantial evidence in the record.  The Board's finding today in response to the court's interlocutory order clarifies for the court that the Board intended to find and does hereby explicitly find that the project has a long term sustainable water supply."

The Board of Supervisors further stated in Resolution No. 14-360 that "[t]o the extent that the Board's action today finding that the project has a long term sustainable water supply could be construed as a discretionary action subject to CEQA, the Board finds pursuant to . . . section 21166 and CEQA Guidelines section 15162[4] that no additional environmental review for this action is required because there are no substantial changes in the project description, no changes in circumstances, and no new significant information that would require revision to the [EIR] prepared for the project."

---

[3] This court denied Highway 68's writ petition challenging the trial court's July 29, 2014 order of interlocutory remand and requesting a stay of the order.  (*The Highway 68 Coalition v. Superior Court*, denied, Dec. 12, 2014, H041478.)  This court granted Omni's motion to dismiss Highway 68's appeal of the July 29, 2014 order of interlocutory remand as taken from a nonappealable order.  (*The Highway 68 Coalition v. County of Monterey*, granted, Mar. 23, 2015, H041505.)

[4] "The regulations that guide the application of CEQA are set forth in title 14 of the California Code of Regulations, and are often referred to as the CEQA Guidelines. [Citation.]" (*Pfeiffer v. City of Sunnyvale City Council* (2011) 200 Cal.App.4th 1552, 1561, fn. 5 (*Pfeiffer*); hereafter CEQA Guidelines or Guidelines.)

**F.** *Ruling After Interlocutory Remand and Judgment*

In March 2015, Highway 68 filed an "opening brief" contending that its writ petition should be granted because the County had violated procedural due process during the remand proceedings and also had violated CEQA. In April 2015, Highway 68 filed a motion for leave to file a supplemental writ petition in which Highway 68 sought a writ of mandate directing the County to set aside Resolution No. 14-360. The trial court granted the motion.

After further briefing and oral argument by the parties, including Omni's opposition to Highway 68's "opening brief," the trial court entered a "Ruling on Respondent's Actions on Interlocutory Remand" on June 18, 2015. The trial court began its ruling by finding that procedures on remand had not violated due process, as follows: (1) the hearing notice provided to Highway 68 was legally sufficient; (2) Highway 68 had sufficient time to review and analyze the documents provided to the Board by the County; (3) Omni's pre-hearing meeting with one supervisor did not establish bias; (4) the Board's failure to consider the material submitted by Highway 68 at the remand hearing did not violate due process; (5) Highway 68 had a reasonable opportunity to be heard at the remand hearing; and (6) even assuming that Highway 68 did not receive adequate notice and an opportunity to be heard, Highway 68 had failed to show prejudice.

The trial court next considered whether substantial evidence supported the Board's finding that the Omni project "has a long term, sustainable water supply both in quality and quantity to serve the development in accordance with the 2010 Monterey County General Plan Policies PS 3.1 and PS 3.2 and is therefore consistent with Policies PS-3.1 and PS-3.2." The court found that the County's conclusion that the project would achieve a positive water balance by using a water recharge system and limiting water demand to 9.0 AFY was supported by substantial evidence.

Having accepted "the Board's findings clarifying its intent in 2012 as to the Board's Finding 9: that the Board intended to find that the Project has a Long Term

9

Sustainable Water Supply consistent with the requirements of the 2010 Monterey County General Plan," the trial court lifted the stay on its prior decision and denied Highway 68's petition for a writ of mandate.

Judgment in favor of the County and Omni was filed on July 27, 2015. The judgment also states that the July 29, 2014 order of interlocutory remand and the June 18, 2015 ruling on respondent's action on interlocutory remand together constitute the court's statement of decision.

## III. DISCUSSION

On appeal, Highway 68 contends that the trial court erred in denying its petition for writ of mandate for several reasons: (1) the trial court erred in issuing an interlocutory remand; (2) the County violated Highway 68's right to procedural due process on interlocutory remand; (3) the County violated CEQA because the water supply analysis was inadequate, the analysis of the project's consistency with the County's general plan was inadequate, the EIR's traffic analysis was inadequate, and environmental review of Omni's project was improperly segmented.

We will begin our evaluation of Highway 68's contentions with the procedural issues raised on appeal.

### A. *Propriety of Interlocutory Remand*

According to Highway 68, the trial court erred in issuing an interlocutory remand to allow the County to make a finding of a long term sustainable water supply for the Omni project, as required by the County's 2010 general plan, because CEQA does not authorize an interlocutory remand where an agency has abused its discretion under CEQA. Highway 68 maintains that where an agency has abused its discretion the only allowable procedure, as set forth in section 21168.9, is an order made by way of a writ of mandate compelling compliance with CEQA.

The County responds that an interlocutory remand to the Board was within the trial court's inherent powers and Omni agrees. Omni further argues that section 21168.9

10

does not apply to bar the interlocutory remand in this case, for two reasons: (1) the trial court found that the County had complied with CEQA with regard to water resources because the FEIR included a finding that the project has an adequate long term water supply; and (2) section 15125, subdivision (d) of the CEQA Guidelines does not require an analysis of the proposed project's consistency with the general plan. Omni emphasizes that the County's General Plan, not CEQA, requires a finding that a development has a long-term sustainable water supply.

Relying on *Voices of the Wetlands*, *supra*, 52 Cal.4th 499 and Code of Civil Procedure section 1094.5, Omni also argues that the trial court may properly order an interlocutory remand to clarify the County's intent regarding the question of whether the project is consistent with the general plan because it has a long term sustainable water supply. Alternatively, Omni and the County assert that Highway 68 has waived any claim of general plan inconsistency because the petition for writ of mandate did not raise any issues of general plan inconsistency.

We need not address the issue of waiver because we will resolve the issue of whether the trial court was authorized to order an interlocutory remand in this case on the merits. We also need not consider Highway 68's contention that the trial court erred under CEQA by failing to conclude that the "EIR did not properly address the inconsistency of the proposed Project with the General Plan," which is raised for the first time in the reply brief. Appellate courts ordinarily will not consider new issues that are raised for the first time in the appellant's reply brief as the respondent has no opportunity to counter such contentions. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764-765.)

We determine that the issue of whether a proposed project is consistent with a county's general plan is not a CEQA issue, and therefore the mandate procedures provided for CEQA violations at section 21168.9 do not apply. The CEQA Guidelines provide: "The EIR shall discuss any inconsistencies between the proposed project and

11

applicable general plans, specific plans and regional plans." (Guidelines, § 15125, subd. (d).) Thus, as this court has stated, " ' "[w]hile there is no requirement that an EIR itself be consistent with the relevant general plan, it must identify and discuss any *inconsistencies* between a proposed project and the governing general plan. [Citation.]" [Citation.] "Because EIRs are required only to evaluate 'any *inconsistencies*' with plans, no analysis should be required if the project is *consistent* with the relevant plans. [Citation.]" [Citation.]' [Citation.]" (*Pfeiffer*, *supra*, 200 Cal.App.4th at p. 1566.) Accordingly, "the agency's decisions regarding project consistency with a general plan are reviewed by ordinary mandamus." (*San Francisco Tomorrow v. City and County of San Francisco* (2014) 229 Cal.App.4th 498, 515.)

Since an agency's decisions regarding general plan consistency are reviewed by ordinary mandamus, we determine that the trial court did not err in ordering an interlocutory remand in this case. The California Supreme Court stated in *Voices of the Wetlands* that "[d]ecisions have long expressed the assumption that the court in a mandamus action has inherent power, in proper circumstances, to remand to the agency for further proceedings prior to the entry of a final judgment. [Citations.] . . . [¶] We perceive no compelling reason why the Legislature would have wished to categorically bar interlocutory remands in administrative mandamus actions." (*Voices of the Wetlands*, *supra*, 52 Cal.4th at p. 527; see also *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 81 [trial court has inherent power in mandamus action to remand a matter to an administrative agency for clarification of ambiguous findings]; *Keeler v. Superior Court* (1956) 46 Cal.2d 596, 600 [court's inherent power to control the course of litigation includes "the power to remand a cause in mandamus for further proceedings which are deemed necessary for a proper determination"].)

In *Voices of the Wetlands,* the trial court had ordered a limited interlocutory remand to a Regional Water Board to allow it " 'to conduct a thorough and comprehensive analysis' " on a specific issue (finding No. 48 regarding cooling water

12

intake structures) that was not supported by the weight of the evidence. (*Voices of the Wetlands*, *supra*, 52 Cal.4th at p. 513; see id. at pp. 507, 510, 525-531.) Our Supreme Court determined that "[u]nder the circumstances presented, the trial court's choice to utilize this device was eminently practical. Plaintiff's mandamus petition challenged only a single, discrete facet of the lengthy and complex [National Pollutant Discharge Elimination System] permit order . . . . The trial court ultimately concluded that a single finding on this issue—finding No. 48—lacked evidentiary and analytic support. Confronted with this situation, the trial court reasonably concluded it need not, and should not, enter a final judgment vacating the entire permit pending further consideration of that issue." (*Id.* at p. 529.)

For these reasons, our Supreme Court concluded in *Voices of the Wetlands* that the trial court had properly ordered an interlocutory remand to the Regional Water Board "to resolve perceived deficiencies" in the evidentiary and analytical support for finding No. 48 in advance of a final judgment. (*Voices of the Wetlands*, *supra*, 52 Cal.4th at p. 530.) We reach a similar result in the present case. Here, there was a single, discrete issue of general plan consistency that the trial court determined required clarification before the County's approval of Omni's project could be upheld. The Board of Supervisors found that " '[t]he Project has an *adequate long-term water supply*,' " although County's 2010 general plan requires "a 'specific finding and supporting evidence' of a *long-term sustainable water supply*." (Italics added.) The court stayed its July 29, 2014 intended decision and issued an interlocutory remand "so the Board of Supervisors can decide whether or not there is a Long Term Sustainable Water Supply." Guided by the decision in *Voices of the Wetlands*, we determine that "[u]nder the circumstances presented, the trial court's choice to utilize this device was eminently practical" and well within the court's inherent power in a mandamus action "to remand to the agency for further proceedings prior to the entry of a final judgment." (See *Id.* at pp. 529, 527.)

13

Highway 68 contends that the present case is distinguishable from *Voices of the Wetlands*, since that decision did not involve CEQA, and therefore the trial court was not authorized to utilize the interlocutory remand procedure. We disagree, since, as we have discussed, the interlocutory remand in this case involved a discrete, non-CEQA issue of general plan consistency that is subject to review by mandamus, and our Supreme Court in *Voices of the Wetlands* instructed that "the court in a mandamus action has inherent power, in proper circumstances, to remand to the agency for further proceedings prior to the entry of a final judgment. [Citations.]" (*Voices of the Wetlands*, *supra*, 52 Cal.4th at p. 527.) We therefore find no merit in Highway 68's challenge to the trial court's order of interlocutory remand in this case.

**B.** *Due Process on Remand*

Highway 68 contends that the proceedings held before the Board of Supervisors pursuant to the trial court's order of interlocutory remand violated due process, for several reasons: (1) the County failed to provide reasonable notice of the remand hearing to Highway 68; (2) a member of the Board of Supervisors had ex parte communications with Omni before the remand hearing; and (3) Highway 68 did not have a fair opportunity to review the draft resolution or County staff's nearly 300-page report before the remand hearing.

In *Voices of the Wetlands*, our Supreme Court ruled that on interlocutory remand "any agency reconsideration must fully comport with due process, and may not simply allow the agency to rubberstamp its prior unsupported decision. . . . [¶] However, a limited interlocutory remand raises no greater inherent danger in these regards than does a final judgment ordering limited reconsideration, as expressly authorized by subdivision (f) of [Code of Civil Procedure] section 1094.5." (*Voices of the Wetlands*, *supra*, 52 Cal.4th at pp. 528-529.)

We find the decision in *CREED-21 v. City of San Diego* (2015) 234 Cal.App.4th 488 (*CREED-21*) to be instructive with regard to the procedural due process to which a

14

citizen group is entitled in opposing a project in a CEQA-related hearing before a local agency. In *CREED-21*, an environmental organization (CREED) contended that a due process violation had occurred in the hearing on CREED's appeal of a city's finding that a project was exempt from CEQA. (*CREED-21, supra,* at p. 517.) CREED claimed that it had not received the City of San Diego's initial study, which determined that the project would not result in significant environmental impacts, before CREED's appeal. (*Id.* at pp. 494, 517.)

The *CREED-21* court noted that " '[d]ue process . . . "does not require any particular form of notice or method of procedure. If the [administrative remedy] provides for reasonable notice and a reasonable opportunity to be heard, that is all that is required [for due process]. [Citations.]" ' [Citation.] Due process requires a fair trial before an impartial tribunal, but it is the substance, and not the technical formalism, of an administrative procedure that affords due process. [Citations.]" (*CREED-21*, *supra*, 234 Cal.App.4th at p. 517.) The *CREED-21* court concluded that "[t]he fact CREED did not have that one item of evidence (i.e., the initial study) at the time of the appeal hearing did not violate its right to due process of law and a fair hearing. It received reasonable notice of the hearing and a reasonable opportunity to be heard at the hearing." (*Id*. at p. 518.) Further, "[i]t was represented at the hearing and argued for a finding that the project was not exempt from CEQA." (*Id*. at p. 517.)

Our standard of review is de novo. "A challenge to the procedural fairness of the administrative hearing is reviewed de novo on appeal because the ultimate determination of procedural fairness amounts to a question of law. [Citations.]" (*Nasha v. City of Los Angeles* (2004) 125 Cal.App.4th 470, 482.) We will independently review each of Highway 68's claims of procedural unfairness.

### 1. Notice

Highway 68 contends that it was deprived of due process because the County gave less notice of the hearing on remand to Highway 68 than it did to Omni. According to

Highway 68, the County gave Omni 32-days notice of the December 16, 2014 hearing on remand, but gave 11-days notice of the same hearing to Highway 68.

Omni responds, and the County agrees, that the notice given to Highway 68 of the December 16, 2014 hearing was reasonable and therefore satisfied due process, since the 11-days notice complied with the notice provisions of Monterey County Code and Government Code section 54954.2, subdivision (a)(1) [public hearing agenda must be posted 72 hours before the hearing].

We are not convinced by Highway 68's argument that the notice provided by the County for the December 16, 2014 hearing on remand violated procedural due process. Highway 68 received notice more than 10 days before the hearing, which exceeded the notice period for the general public under the provisions of the Monterey County Code. Monterey County Code, section 21.78.030 provides in part that "[a]ny action to approve or deny any application for a discretionary permit by an Appropriate Authority, including the Board of Supervisors, shall require that a public hearing be held and notice given pursuant to this Chapter." Notice of the public hearing must be mailed or delivered to the owner of the subject real property and the project applicant at least ten days prior to the hearing. (*Id.*, § 21.78.040(A)(1).) As for notice to the general public, the Monterey County Code provides that "[a]t least three public hearing notices shall be clearly posted at three different public places on and near the subject property. The notices shall be accessible and visible to the public." (*Id.*, § 21.78.040(A)(4).)

Highway 68 has not provided any authority for the proposition that, as a citizen group opposing a project, it is entitled to public hearing notice equal to the notice given to the project applicant. To the extent Highway 68 relies on the provisions of the Administrative Procedure Act, Government Code section 11400 et seq. for this proposition, its reliance is misplaced. The Administrative Procedures Act expressly does

not apply to a local agency, such as a county and its governing board of supervisors, with exceptions not applicable here.  (Gov. Code, § 11410.30, subd. (b).)[5]

Moreover, the decision in *Citizens for Ceres v. Superior Court* (2013) 217 Cal.App.4th 889 (*Citizens for Ceres*), on which Highway 68 also relies, does not support its argument.  The decision in *Citizens for Ceres* concerned issues of attorney-client privilege and attorney work product, and did not address any issues concerning public hearing notice.  (See *id*. at pp. 897-899.)  " 'It is axiomatic, of course, that a decision does not stand for a proposition not considered by the court.'  [Citation.]"  (*Agnew v. State Bd. of Equalization* (1999) 21 Cal.4th 310, 332.)

Since the record reflects that Highway 68 received reasonable notice and an opportunity to be heard at the December 16, 2014 hearing on remand, we determine that procedural due process was satisfied with regard to hearing notice.  (See *CREED-21*, *supra*, 234 Cal.App.4th at p. 517.)

### 2. Ex Parte Communications

Highway 68 contends that the County also violated procedural due process because Monterey County Supervisor Calcagno met with representatives of Omni before the December 16, 2014 hearing on remand but canceled his scheduled meeting with Highway 68.

Omni rejects Highway 68's contention on the ground that Highway 68 fails to meet its burden to support its contention with specific evidence demonstrating bias or prejudice on the part of an administrative decision maker.  Omni and the County also

---

[5] At Government Code section 11410.30, the Administrative Procedure Act provides:  "(a) As used in this section, 'local agency' means a county, city, district, public authority, public agency, or other political subdivision or public corporation in the state other than the state.  [¶]  (b) This chapter does not apply to a local agency except to the extent the provisions are made applicable by statute.  [¶]  (c) This chapter applies to an agency created or appointed by joint or concerted action of the state and one or more local agencies."

17

argue that Supervisor Calcagno was not precluded from undertaking an independent investigation of a pending matter or from having contact with Omni.

The California Supreme Court has instructed that in the administrative context, "[a]bsent a financial interest, adjudicators are presumed impartial. [Citations.] To show nonfinancial bias sufficient to violate due process, a party must demonstrate actual bias or circumstances ' "in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." ' [Citations.] The test is an objective one. [Citations.]" (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 219 (*Today's Fresh Start*).)

We agree with Omni and the County that Highway 68 fails to demonstrate that Supervisor Calcagno's meeting with representatives of Omni demonstrates bias sufficient to violate due process. (See *Today's Fresh Start, supra,* 57 Cal.4th at p. 219.) Our Supreme Court has stated that a member of a city council "has not only a right but an obligation to discuss issues of vital concern with his [or her] constituents and to state his [or her] views on matters of public importance." (*City of Fairfield v. Superior Court* (1975) 14 Cal.3d 768, 780.) This right obviously has equal application to Supervisor Calcagno as a member of County's Board of Supervisors. Moreover, we observe that Highway 68 has provided no authority for the proposition that a member of a county board of supervisors who meets with a project applicant must also meet with a project opponent.

Highway 68's reliance on a provision of the Administrative Procedures Act, Government Code section 11430.10, subdivision (a), to bar Supervisor Calcagno's meeting with Omni's representatives as constituting "improper ex parte communications between decision makers and interested parties" is again misplaced. As we have discussed, the Administrative Procedures Act does not apply to the Board of Supervisors' hearing on remand because the County is a local agency. (See Gov. Code, § 11410.30, subd. (b).)

18

We therefore determine that Highway 68 has not met its burden to demonstrate that Supervisor Calcagno's meeting with representatives of Omni constitutes a violation of due process.

### 3. **Opportunity to Review Draft Resolution and County Staff Report**

Highway 68 also contends that due process violations occurred when the County provided Omni with a copy of the draft resolution a few days before giving a copy to Highway 68, and "delayed releasing the staff's nearly 300-page report until *Friday, December 12, for the hearing on Tuesday, December 16.*" Highway 68 asserts that as a result of the delay neither Highway 68 nor its expert had sufficient time to "prepare and submit evidence and argument on complex water issues."

Omni responds that Highway 68 has not provided any authority that would prohibit the County from seeking comment from Omni on the draft resolution, and in any event, the County did not accept any of Omni's proposed "minor edits" to the draft resolution. Omni also points out that "[o]f the approximately 300 pages of the [staff] Report, [Highway 68] already had all but 14 pages, and those 14 pages made it very clear that the County staff was recommending that the Board [of Supervisors] make a finding, based on the existing record, that the Project will have a long-term sustainable water supply."

Highway 68 does not dispute Omni's assertion that the 300-page staff report contained only 14 pages that were not already in Highway 68's possession. Highway 68 also does not dispute that the trial court's July 29, 2014 order on interlocutory remand provided Highway 68 with over four-months notice of the water issue to be determined at the hearing on remand. The order states that "the County is required to determine whether or not there is a Long Term Sustainable Water Supply." Moreover, Highway 68 has provided no authority for the proposition that procedural due process requires that a draft resolution and a staff report be provided to a project opponent more than two days before a hearing on remand.

19

Although Highway 68 relies on the decision in *Voices of the Wetlands* for the proposition that procedural due process entitles a project opponent to the same notice of the remand hearing and the same communications with the County as the project applicant, we find no support for that proposition in *Voices of the Wetlands*. To the contrary, our Supreme Court in *Voices of the Wetlands* rejected any suggestion of procedural unfairness in the remand proceedings because the court found that "in compliance with the trial court's directive, the Regional Water Board engaged in a full reconsideration of the [remand] issue, and gave all interested parties, including plaintiff, a noticed opportunity to appear and to present evidence, briefing, and argument pertinent to the . . . determination." (*Voices of the Wetlands*, *supra*, 52 Cal.4th at p. 530.)

Here, the record reflects the Board of Supervisors engaged in a full reconsideration of the water issue on remand, as directed by the trial court in the order on interlocutory remand, and Highway 68 had notice of the December 16, 2014 hearing and was able to appear at the hearing and present its evidence and argument. We therefore find no merit in Highway 68's contentions that the purported delay in receiving the 300-page staff report and the draft resolution constituted a violation of procedural due process.

## C. *CEQA Issues*

Highway 68 contends that the County violated CEQA because the FEIR was inadequate due to (1) an inadequate water supply analysis; (2) an inadequate traffic analysis; and (3) improper segmentation of the environmental review of Omni's project.

We will begin our analysis of Highway 68's contentions with a brief overview of CEQA and its EIR requirement before addressing each issue and the applicable standard of review.

### 1. CEQA Overview

" 'CEQA [(section 21000 et seq.)] embodies our state's policy that "the long-term protection of the environment . . . shall be the guiding criterion in public decisions." '

20

[Citations.]  As this court has observed, 'the overriding purpose of CEQA is to ensure that agencies regulating activities that may affect the quality of the environment give primary consideration to preventing environmental damage.  [Citation.]'  [Citation.]" (*Save Our Carmel River v. Monterey Peninsula Water Management Dist.* (2006) 141 Cal.App.4th 677, 687 (*Save Our Carmel River*).)

The first tier of the CEQA process requires an agency to conduct a preliminary review to determine whether CEQA applies to a proposed project.  (Guidelines, §§ 15060, 15061; *Save Our Carmel River, supra,* 141 Cal.App.4th at p. 687.)  "Under CEQA, a public agency must prepare an EIR only with regard to "projects that may have significant environmental effects.  (§§ 21100, subd. (a), 21151, subd. (a))." (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 315.)

"The EIR's function is to ensure that government officials who decide to build or approve a project do so with a full understanding of the environmental consequences and, equally important, that the public is assured those consequences have been taken into account.  [Citation.]  For the EIR to serve these goals it must present information in such a manner that the foreseeable impacts of pursuing the project can actually be understood and weighed, and the public must be given an adequate opportunity to comment on that presentation before the decision to go forward is made."  (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 449-450 (*Vineyard*).)

Specifically, " '[t]he EIR must describe the proposed project and its environmental setting, state the objectives sought to be achieved, identify and analyze the significant effects on the environment, state how those impacts can be mitigated or avoided, and identify alternatives to the project, among other requirements.'  [Citation.]"  (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 979.)  However, " ' "[t]echnical perfection is not required; the courts have looked not for an exhaustive

21

analysis but for adequacy, completeness and a good-faith effort at full disclosure." '
[Citations.]" (*Ibid*.) "Nevertheless, given the key role of the EIR in carrying out
CEQA's requirements, 'the integrity of the process is dependent on the adequacy of the
EIR.' [Citation.]" (*Id.* at pp. 979-980.)

### 2. Standard of Review

Our Supreme Court recently stated the applicable standard of review in *Banning
Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918, 934-935 (*Banning
Ranch*). " '[A]n agency may abuse its discretion under CEQA either by failing to
proceed in the manner CEQA provides or by reaching factual conclusions unsupported
by substantial evidence. (§ 21168.5.) Judicial review of these two types of error differs
significantly: While we determine de novo whether the agency has employed the correct
procedures, "scrupulously enforc[ing] all legislatively mandated CEQA requirements"
[citation], we accord greater deference to the agency's substantive factual conclusions.
In reviewing for substantial evidence, the reviewing court "may not set aside an agency's
approval of an EIR on the ground that an opposite conclusion would have been equally or
more reasonable," for, on factual questions, our task "is not to weigh conflicting evidence
and determine who has the better argument." [Citation].' " (*Id.* at p. 935.)

The burden of showing that the EIR is inadequate is on the party challenging the
EIR. (*California Native Plant Society v. City of Rancho Cordova* (2009) 172
Cal.App.4th 603, 626 (*Native Plant Society*).) To meet this burden, the party challenging
the EIR must affirmatively show that there is no substantial evidence in the record to
support the agency's findings. (*Ibid.*) This requires setting forth all of the evidence
material to the agency's findings, then showing that the evidence could not reasonably
support the finding. (*Ibid*.) "[S]imply pointing to portions of the administrative record"
that arguably support the position of the party challenging the EIR is insufficient. (*Ibid*.)

22

### 3. Water Supply Analysis

Highway 68 contends that the water supply analysis in the FEIR is inadequate for several reasons: (1) failure to analyze water rights; (2) inadequate analysis of water balance; (3) uncertainty of the water recharge scheme; (4) understatement of water demand for the project; and (5) failure to fully disclose information about groundwater and soil contamination.

In *Vineyard*, our Supreme Court addressed the issue of "how firmly future water supplies for a proposed project must be identified or, to put the question in reverse, what level of uncertainty regarding the availability of water supplies can be tolerated in an EIR for a land use plan." (*Vineyard*, *supra*, 40 Cal.4th at p. 428.) The court stated four "principles for analytical adequacy under CEQA," as follows. (*Id*. at p. 430.)

First, an EIR is inadequate if it "simply ignores or assumes a solution to the problem of supplying water to a proposed land use project. Decision makers must, under the law, be presented with sufficient facts to 'evaluate the pros and cons of supplying the amount of water that the [project] will need.'" (*Vineyard*, *supra*, 40 Cal.4th at p. 431.)

Second, "future water sources for a large land use project and the impacts of exploiting those sources are not the type of information that can be deferred for future analysis. An EIR evaluating a planned land use project must assume that all phases of the project will eventually be built and will need water, and must analyze, to the extent reasonably possible, the impacts of providing water to the entire proposed project." (*Vineyard*, *supra*, 40 Cal.4th at p. 431.)

Third, "the future water supplies identified and analyzed must bear a likelihood of actually proving available; speculative sources and unrealistic allocations ('paper water') are insufficient bases for decisionmaking under CEQA. [Citation.] An EIR for a land use project must address the impacts of *likely* future water sources, and the EIR's discussion must include a reasoned analysis of the circumstances affecting the likelihood of the water's availability." (*Vineyard*, *supra*, 40 Cal.4th at p. 432.)

23

Fourth, "where, despite a full discussion, it is impossible to confidently determine that anticipated future water sources will be available, CEQA requires some discussion of possible replacement sources or alternatives to use of the anticipated water, and of the environmental consequences of those contingencies. [Citation.] . . . [W]hen an EIR makes a sincere and reasoned attempt to analyze the water sources the project is likely to use, but acknowledges the remaining uncertainty, a measure for curtailing development if the intended sources fail to materialize may play a role in the impact analysis." (*Vineyard*, *supra*, 40 Cal.4th at p. 432.)

Therefore, as noted by this court in *Habitat & Watershed Caretakers v. City of Santa Cruz* (2013) 213 Cal.App.4th 1277 (*Habitat & Watershed Caretakers*), under *Vineyard* "[a]n EIR is not required to 'establish[ ] a likely source of water,' but may satisfy CEQA by 'address[ing] the reasonably foreseeable *impacts* of supplying water to the project,' 'acknowledg[ing] the degree of uncertainty involved, discuss[ing] the reasonably foreseeable alternatives,' and 'disclos[ing] the significant foreseeable environmental effects of each alternative, as well as mitigation measures to minimize each adverse impact.' [Citation.]" (*Habitat & Watershed Caretakers, supra,* at p. 1291.) Guided by these "principles for analytical adequacy under CEQA," we will address each water analysis issue raised by Highway 68 in turn. (*Vineyard*, *supra*, 40 Cal.4th at p. 430; see *id*. at pp. 430-432.)

### *Water Rights Analysis*

Highway 68 argues that the FEIR's analysis of the water rights for the project is inadequate because the analysis did not satisfy *Vineyard*'s requirement that "[w]here water rights are uncertain and affect water supply, they must be discussed in the EIR with a clear and coherent discussion based on material presented in the EIR." Specifically, Highway 68 maintains that the "will serve" letter for Omni's project from the California American Water Company (Cal-Am) is inadequate as an informational document regarding water rights.

24

Omni responds that the FEIR includes documentation showing that (1) the project site has been in the service area of Cal-Am or its predecessor, the Ambler Park Water Utility, since 1975; (2) the water infrastructure (water lines, sewer lines, and fire hydrants) for commercial development of the site has been constructed and is currently operational; (3) Cal-Am provided a "will serve" letter in 2001 indicating that the project site is within its service area and it will serve water to the site; and (4) the EIR states that Cal-Am is licensed by the California Public Utilities Commission and has sufficient supplies and production capacities to serve the project site.

Highway 68 argues that the decision in *Vineyard* stands for the proposition that "[w]here water rights are uncertain and affect water supply, they must be discussed in the EIR with a clear and coherent discussion based on material presented in the EIR." However, the water rights discussion in *Vineyard* concerned Government Code section 66473.7, which "generally requires a city or county, before approving a subdivision map for a residential development of more than 500 units, to obtain from the applicable public water system a 'written verification' that adequate water supplies will be available for that project . . . . When the verification rests on supplies not yet available to the water provider, it is to be based on firm indications the water will be available in the future, including written contracts for water rights . . . ." (*Vineyard*, 40 Cal.4th at p. 433.) Since Omni's project does not involve residential development of more than 500 units, Government Code section 66473.7 does not apply to the EIR in this case. However, even assuming that a discussion of water rights is required in an EIR as part of the requisite water supply analysis (see *Vineyard*, *supra*, at p. 432) we determine that substantial evidence in the administrative record shows that there is no uncertainty regarding the water rights for the project's water supply.

The draft EIR states in its discussion of utilities that "[t]he Site is currently undeveloped and is within the Ambler Park Water System service area. The Ambler Park Water System is a public water system owned and operated by the California American

Water Company (Cal-Am) [citation.] Cal-Am is responsible for ensuring that water supplies meet water demand and that State and federal water quality standards are achieved within the Ambler Park Water System service area." The draft EIR further states that "[t]he proposed Corral de Tierra Neighborhood Retail Village project will be supplied with potable water by California-American Water Company (Cal-Am) in Monterey, California. In a letter dated February 14, 2001 . . . , Lesley Silva of Cal-Am states that the subject property is located within the Cal-Am service area and that Cal-Am will serve water to the site. Discussions with Mr. Fred Feizollahi, Senior Operations Engineer with Cal-Am indicates that water delivered to the Omni Enterprises development will be sourced from the wells of Ambler Park."

Based on the above statements in the draft EIR, we find that the FEIR includes sufficient evidence showing that the water rights for the water supply for Omni's project are certain because Cal-Am has the ability to provide water to the project site from the wells owned by the public Ambler Park Water System. We therefore find no merit in Highway 68's contention that the EIR is inadequate because the water rights analysis is inadequate.

### Water Balance Analysis

Highway 68 argues that the FEIR is inadequate because the "water balance approach proposed by Omni" is uncertain and relies "upon several uncertain, unanalyzed and unsupported factors," including the failure to address the water supply in a dry year. Highway 68 also argues that the water cap included in the County's Condition 86 for the project approval cannot be relied upon for water balance because the water cap of 9 AFY can be exceeded if a fine is paid.

According to Omni, substantial evidence supports the County's conclusion that the groundwater recharge system will balance the project's water demand and result in a less than significant impact to groundwater resources. Omni also emphasizes the discussion in the expert reports indicating that the recharge system would function in dry or drought

26

periods and stating that the water balance analysis was based on "long-term mean annual rainfall data." In addition, Omni asserts that Condition 86 "precludes the Project from using more than 9 afy, providing further assurances that the groundwater basin will realize a net benefit, not harm, and no adverse impacts to the groundwater resources will ensue."

Our review of the FEIR shows that the issue of water balance was extensively discussed, and the factors used to calculate water demand for Omni's project, as well as the recharge anticipated from the groundwater recharge system, were identified and quantified. For example, the master responses to comments includes the following: "Commenters are referred to Table 4.7.B on page 256 [of the draft EIR] and Tables 6B on page 462 and Table 6.E on page 479 for the water balance analysis for the Proposed Project and each alternative. The area used for calculating the Project's water balance (i.e. recharge that will be collected and directed to the underground water basin) included [¶] Project Site (11 acres) [and] [¶] Gas Station Site (.7 acres)."

Table 4.7.B shows the water balance analysis for the proposed project, based on the quantities of water use by "Commercial/Retail/Office," "Restaurant/Deli/Food Service," and "Landscaping," and the quantity of total groundwater recharge. Table 6.B shows a similar water balance analysis for "Alternative 2; LEED Silver Design" and Table 6.E similarly shows a similar water balance analysis for the reduced density/ redesigned project alternative We observe that Table 6.D provides a comparison of the water balance for the proposed project and the reduced density/redesigned project, with both water demand and water recharge quantified.

We further observe that the source of the water demand factors for the water balance analysis was identified and discussed in the draft EIR. For example, the master responses to comments states: "In this case the water demand factor for Retail Uses was taken from the [Marina Coast Water District] and the food service factor was taken from the [Monterey Peninsula Water Management District]. . . . The factors of both [Marina

27

Coast Water District] and [Monterey Peninsula Water Management District] are included in the appendix to this document."

Regarding the rainfall factor in the water balance analysis, the draft EIR states: "The water balance analyses are based upon long term mean annual rainfall data for the County. Rainfall data and correction factors were derived from Monterey County Water Resource Agency data analysis. The average rainfall factor assumed by Whitson (October 14, 2009, 'Potential for Increased Groundwater Recharge') was 15.5.[] 'This information was derived from the Laguna Seca Subarea Phase III Hydrogeologic Update (November 2002, prepared for the Monterey Peninsula Water Management District by Eugene B Yates, Martin B. Feeney, and Lewis I, Rosenberg). This is considered to be a conservative number given that the Geosyntec Report 2006 assumed an average annual rainfall of 16.70[] per year."

The draft EIR also includes the response of Omni's hydrology expert, William Halligan, to criticism of the water balance analysis by Highway 68's hydrology expert, Tim Parker: "Parker also states . . . that the EIR failed to consider how dry years or drought cycles would impact Project recharge. In reality, the use of average annual data by definition incorporates both dry/drought periods along with wet periods to establish a long term average, as was done in this case. In addition, supporting technical documents in the EIR and in Planning Commission hearing materials demonstrated how the Project's recharge facility would function to advantage in dry/drought periods."

The inclusion of Condition 86 in the County's project approval does not change our analysis of the water balance issue. As set forth in Resolution No. 12-040, Condition 86 states in part: "WATER USE LIMITATION. [¶] 1. Reporting [¶] The owner shall provide annual reports to the Director of Planning and the General Manager of the Water Resources Agency of water consumption on the site. [¶] 2. Water Cap [¶] The total amount of water which can be used on the site (both Parcels A and B) on an annual basis shall not exceed nine (9) acre feet per year [the 'water use cap']. If the

28

annual reporting shows that the average annual water use for the three (3) most recent years [the 'average annual water use'] exceeds the 9 acre feet per year water use cap, a fine of $35,000 per acre foot of such exceedance shall be assessed against the project.  If the average annual water use for the project exceeds the 9 acre feet per year water use cap for three (3) or more successive years, the amount of the fine shall be progressive for each year that the site exceeds the water cap.  Starting with the third consecutive year that the average annual water use cap is exceeded, the fine will be multiplied by that number of consecutive years that the average annual water use exceeds 9 acre feet.  All fines collected shall be paid to the Monterey County Water Resources Agency, and shall be used exclusively to improve water resources within the El Toro Primary Aquifer System."

Highway 68 provides no authority for the proposition that an agency's imposition of a fine to mitigate water use may not contribute to the water balance analysis.  This court has stated:  "Fee-based infrastructure mitigation programs have been found to be adequate mitigation measures under CEQA.  [Citations.]"  (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 140 (*Save Our Peninsula*).)  This court also stated:  "Of course a commitment to pay fees without any evidence that mitigation will actually occur is inadequate.  [Citation.]"  (*Ibid.*)  Here, it is impossible to know whether the water cap will be exceeded in the future, causing the Condition 86 fines to be imposed.  However, Condition 86 expressly provides for the reporting of water usage and the collection of fines by the Monterey County Water Resources Agency where the water cap is exceeded.

For these reasons, we are not convinced by Highway 68's argument that the water balance analysis in the FEIR is inadequate because it is uncertain or relied upon unanalyzed and unsupported factors.

*Uncertainty of Water Recharge System*

We understand Highway 68 to contend that the draft EIR is inadequate because it failed to investigate or disclose the uncertainty of the water recharge system as a mitigation measure. Highway 68 asserts that the draft EIR's analysis of the water recharge system is deficient because it fails to address the uncertainty arising from the lack of stormwater runoff from small rain events or from the potential unavailability of water runoff from a hillside that Omni does not control and a gas station site that Omni may not own in the future. Highway 68 also argues that there is uncertainty because the amount of water infiltration from the recharge system is not quantified.

Omni argues to the contrary that there is "overwhelming" evidence in the administrative record demonstrating that the water recharge system is a "proven, feasible method for balancing Project water demand." This evidence includes, according to Omni, the opinions of hydrology experts, County's environmental consultants, and representatives of the Monterey County Water Resources Agency and County staff. Omni also argues that the conflicting opinions of Highway 68's hydrology expert cannot serve as a basis to find that the EIR is inadequate. We agree.

Section 15151 of the CEQA Guidelines provides in part that "[d]isagreement among experts does not make an EIR inadequate, but the EIR should summarize the main points of disagreement among the experts." Moreover, our standard of review precludes reweighing the evidence. (*Banning Ranch*, *supra*, 2 Cal.5th at p. 935.) For these reasons, the existence of a disagreement among experts does not undermine the substantiality of the evidence in support of a finding in an EIR. (See *Save Cuyama Valley v. County of Santa Barbara* (2013) 213 Cal.App.4th 1059, 1069 (*Save Cuyama Valley*).)

Here, in Resolution No. 12-040 the Board of Supervisors stated the finding that "[t]he project would use a maximum of 9.0 acre-feet per year (AFY) of water and the underground water recharge system approved for the 99,970 square foot project would return 9.66 AFY of water to the underground basin which results in a net positive water

balance. [¶] . . . The project has been conditioned to ensure that the water use is limited and maintained at 9 .0 AFY."

Among other evidence in the administrative record supporting the Board of Supervisor's findings, we note that Omni's expert, Halligan, responding to the opinion of Parker, Highway 68's expert, that the stormwater recharge system was uncertain, stated: "[Parker] asserts that there were no calculations or acknowledgments of uncertainties in the hydrologic analyses for the project's stormwater recharge system. This ignores the detailed calculations presented in the EIR and supported by testimony to the Planning Commission and Board of Supervisors that consistently used conservative assumptions in calculating the expected quantity of stormwater recharge. In fact, the conservative nature of the assumptions was specifically identified in the peer review of the analyses carried out by Balance Hydrologics in August 2010." Halligan also rejected Parker's opinion that the "ElR analysis fails to answer how the amount of captured stormwater will be measured. This issue was covered extensively in Planning Commission staff reports and deliberations, and as part of project mitigation measures."

In addition, Whitson Engineers provided data for the water use and groundwater recharge for the project, as well as the sources for the data, in a 2011 memorandum that concluded that the water recharge system would return a net increase of 2.76 AFY to the groundwater basin. Balance Hydrologics reported that "[o]ur findings indicate that Whitson Engineers have used conservative assumptions in their calculations and have properly applied the methodology presented in the Hydrogeologic Study to this site-specific analysis."

Since Highway 68's argument generally consists of disagreeing with the opinions of Omni's and County's experts, we determine that Highway 68 has not met its burden to show that the County's findings regarding the water recharge system are not supported by substantial evidence. (See *Save Cuyama Valley, supra,* 213 Cal.App.4th at p. 1069; Guidelines, § 15151.)

31

### Understatement of Water Demand

Highway 68 contends that FEIR fails to provide "an accurate quantification" of the water demand for the project as required by *Vineyard*, *supra*, 40 Cal.4th at pages 441-443. According to Highway 68, Omni provided different quantities for the water demand for the project and also erred in calculating the reduction in water demand due to sustainable landscaping and low-flow fixtures.

Omni rejects Highway 68's contention, pointing out that the water demand for the project was based on technical analysis by experts and arguing that the water demand calculations are therefore supported by substantial evidence.

In *Vineyard*, our Supreme Court found a lack of substantial evidence regarding water demand, as follows: "On the factual question of how future surface water supplies will serve this project as well as other projected demand in the area, the project FEIR presents a jumble of seemingly inconsistent figures for future total area demand and surface water supply, with no plainly stated, coherent analysis of how the supply is to meet the demand. The reader attempting to understand [Sacramento] County's plan for providing water to the entire Sunrise Douglas development is left to rely on inference and speculation. In this respect, the FEIR water supply discussion fails to disclose 'the "analytic route the . . . agency traveled from evidence to action" ' and is thus not 'sufficient to allow informed decision making.' [Citation.]" (*Vineyard*, *supra*, 40 Cal.4th at p, 445.)

In contrast, the FEIR in the present case includes, as we have discussed, Whitson Engineers's 2011 memorandum that provided data for the project's water use and the sources for the data. The memorandum provided the "water balance for the Revised Hybrid LEED Alternative Plan with Reduced Building Area of 99,970 square feet," and stated in Table A that total water use for the project would be 5.83 AFY. The source of the water use data for retail and office was the Marina Coast Water District, and the source of the water use data for food services was the Monterey Peninsula Water

Management District. The water demand for landscaping was based on the landscape design prepared by Hart/Howerton, the landscaping and architectural design consultant for the project, with estimates by Dickson & Associates, Inc., a landscape irrigation design and consulting firm.

We reiterate that Highway 68's disagreement with the opinions of Omni's experts is insufficient to meet Highway 68's burden to show that the FEIR is inadequate because the County's findings regarding water demand are not supported by substantial evidence. (See *Save Cuyama Valley, supra,* 213 Cal.App.4th at p. 1069; Guidelines, § 15151.)

### *Groundwater and Soil Contamination*

Highway 68 contends that the FEIR is inadequate because it fails to disclose soil and water contamination that could be caused by the water recharge system. In particular, Highway 68 asserts that "[t]he EIR did not disclose that the County was aware of soil and water contamination from MTBE ["methyl tertiary-butyl ether"[6]] at the adjacent Omni gas [Exxon] station parcel and the Flowers and Gas [station] parcel located just across Corral de Tierra Road from the Project site."

The draft EIR, which issued in 2010, included the following information regarding groundwater contamination: "Based on the regulatory database search, one site of environmental concern (the adjacent, currently non-operational gasoline service station) was listed within 0.5 mile of the Site. According to information contained in the State's on-line Geotracker database of Leaking Underground Fuel Tank (LUFT) sites, and Spills, Leak, Investigation and Cleanup (SLIC) sites (State Water Resources Control Board [SWRCB], 2007), a leak from a waste oil/used oil underground storage tank, caused by structural failure, was discovered at the currently non-operational gasoline service station located adjacent to the northwest corner of the Site on May 3, 1991, and was reported on

---

[6] *California Building Industry Assn. v. Bay Area Quality Management Dist.* (2015) 62 Cal.4th 369, 389.

July 7, 1991.  The Central Coast Regional Water Quality Control Board assigned Case # T0605300038 to this release.  The date the release began is unknown. . . .  [T]he tanks were removed, and according to the Geotracker Database (SWRCB, 2007), the case was closed on March 26, 1993.”

The draft EIR further states:  “Based on findings from the regulatory database search and the documents reviewed above, no groundwater contamination has been reported or was suspected to be associated with this Site.  No known hazardous material sites are reported to occur at an up-gradient location from the Site with respect to groundwater flow, where contamination might migrate beneath the Project.  In addition, routine analysis of water samples from the nearby Ambler Park water supply wells has not detected any groundwater contaminants (SWRCB, 2008). Thus, contamination of groundwater beneath the Site from off-site sources is unlikely.  Finally, the Site is not included on a list of hazardous materials sites compiled pursuant to Government Code 65962.5.  Therefore, development of the Project would not create significant hazards to the public or the environment from the presence of hazardous materials sites.”

Omni’s experts, Halligan and Ed Ballman of Balance Hydrologics, Inc., responded in an August 2011 memorandum to the opinion of Highway 68’s expert, Parker, regarding MTBE contamination as follows:  “Parker addresses the potential for contamination from leaking underground storage tanks at the adjacent gas station to impact recharged stormwater.  There is no history of MTBE in groundwater at the Project site, and recent tests of the water from the gas station well adjacent to the Project site, and from the Hargis well on the Project site reveal no evidence of MTBE or other pollutants.”

CapRock Geology, Inc. (CapRock) performed a soil and groundwater investigation of the Exxon gas station site (adjacent to the project site) and reported in August 2011 that MTBE was found in one boring on that site.  CapRock also reported that “[t]here is a gasoline service station across Corral de Tierra to the west which is a

34

potential source of MTBE." CapRock recommended that "the impacted soils on the site be remediated to below County and State action levels."

The administrative record therefore indicates that although earlier investigation of soil contamination on the Exxon gas station site did not reveal MTBE contamination at the time the draft EIR was issued in 2010, the later investigation by CapRock found MTBE contamination there in 2011. The County's project approval includes Condition 67, which states: "Prior to issuance of any permits for the shopping center, other than permits required for site remediation, site soil and groundwater contamination on the adjacent [Exxon] gas station site . . . shall be addressed through one of the [two] options [for complete soil remediation]."

As to the Flowers and Gas station site that is across Corral de Tierra Road from the project site, CapRock reported in 2011 that "[t]here is a gasoline service station across Corral de Tierra to the west which is a potential source of MTBE. . . . In letters dated November 19, 2004; July 16, 2009; April 19, 2010; and July 12, 2011 the [Monterey County Environmental Health Department] asked the Corral de Tierra Flower and Gas station to take corrective action to remediate the contamination."

In a January 5, 2012 letter to the Board of Supervisors, CapRock reported that "[t]here is no evidence of either soil or groundwater contamination on the project site of the proposed Corral de Tierra Shopping Village (the 'project site'). There is also no evidence that the contamination found in the one boring on the gas station site is migrating to the project site. [¶] On October 31, 2011, CapRock submitted to MCDEH a work plan entitled 'Site Mitigation for 1 Corral de Tierra Road, Salinas, California.' We received a letter from the MCDEH dated November 1, 2011 approving our proposed work plan for site mitigation for the gas station site."

Highway 68 has not referenced any evidence in the administrative record showing that the County was aware of any potential MTBE contamination of the project site from the Flowers and Gas station site across Corral de Tierra Road from the project site at the

time the draft EIR was prepared. Moreover, the record reflects that CapRock's investigation of soil contamination at the project site in 2011 did not reveal any evidence of migration of soil contamination from the adjacent Exxon site. This information was provided to the Board of Supervisors prior to the public hearing on Omni's project that was held on February 7, 2012. The record also reflects that County staff reported the contamination issue to the Board of Supervisors during a public hearing on July 12, 2011, which included discussion of the issue by representatives of the parties.

We are therefore not convinced by Highway 68's contention that the draft EIR issued in 2010 was inadequate as an informational document on the ground that the County failed to disclose MTBE contamination.

### 4. Traffic Analysis

Highway 68 contends that the draft EIR is inadequate because it failed to disclose that the level of service for "all six nearby segments of Highway 68" are at level F, the worse level of service. Highway 68 also contends that the County's Guide for the Preparation of Traffic Impact Studies requires an analysis of traffic impacts to include roadway segments. In addition, Highway 68 argues that the draft EIR failed to include the cumulative traffic impact of a planned subdivision known as Ferrini Ranch.

According to Omni, the County's Guide for the Preparation of Traffic Studies does not require a project's traffic impacts be analyzed by roadway segments. Omni also asserts that the proposed Ferrini Ranch subdivision was included in the draft EIR's cumulative traffic analysis.

We apply the substantial evidence standard of review to an agency's use of a particular methodology in an EIR: " ' "[W]e apply the substantial evidence test to conclusions, findings, and determinations, and to challenges to the scope of an EIR's analysis of a topic, the methodology used for studying an impact, and the reliability or accuracy of the data upon which the EIR relied because these types of challenges involve

36

factual questions." ' [Citation.]" (*Residents Against Specific Plan 380 v. County of Riverside* (2017) 9 Cal.App.5th 941, 968.)

In *East Sacramento Partnership for a Livable City v. City of Sacramento* (2016) 5 Cal.App.5th 281 the appellate court rejected the project opponent's contention that an EIR failed to analyze roadway segments: "The EIR explained that its traffic analysis was focused on intersections rather than roadway segments because roadway capacity was governed by intersections. Under the [City of Sacramento's] traffic impact analysis guidelines, the decision on which to study should be made on an individual project basis. These guidelines further state that in general, intersections rather than roadways should be studied when analyzing infill areas. Substantial evidence supports the City's methodology in focusing on intersections." (*Id*. at p. 298.)

We reach a similar result in the present case. The draft EIR included analysis of the level of service at eight intersections with Highway 68 in the vicinity of the project, which the County determined should be included in the analysis "in consultation with the County of Monterey, the Transportation Agency for Monterey County (TAMC) and Caltrans." The traffic analysis stated: "The results of the level of service analysis under project conditions show that 7 of the 8 study intersections would operate at an unacceptable LOS [level of service] D or worse (refer to Table 4.12.F) during at least one of the peak hours under project conditions. Based on the County of Monterey Significance Criteria, three study intersections would be impacted by the Project."

The County's Guide for the Preparation of Traffic Studies (Guide) lists 13 different traffic analysis methodologies, including signalized and unsignalized intersections. The Guide states: "Typically, the traffic analysis methodologies for the facility types indicated below are used by Monterey County Public Works and will be accepted without prior consultation." Highway 68's citations to the Guide do not support its contention that the traffic impacts due to Omni's project were required to be analyzed

by the roadway segment methodology. Further, we observe that Highway 68 does not contend that the County's traffic impact analysis is not supported by substantial evidence.

As to cumulative traffic impacts, the administrative record reflects, contrary to Highway 68's contention, that the proposed Ferrini Ranch subdivision was included in the draft EIR's traffic study. In a response to comments, the draft EIR states: "The Ferrini Ranch Subdivision and the Harper Canyon Subdivision were included in the Traffic Study for the proposed project. They were omitted from the list of projects considered, and this was an error which has been corrected in the errata." The draft EIR also states: "The study intersections were analyzed for level of service under cumulative conditions with regional projects (*Ferrini Ranch Subdivision Traffic Impact Analysis,* Higgins Associates, April 18, 2008)."

For these reasons, we find no merit in Highway 68's contentions that the draft EIR is inadequate because it did not include an analysis of traffic impacts using the roadway segment methodology and also did not include the cumulative traffic impact of the proposed Ferrini Ranch subdivision.

### 5. Segmentation

Highway 68 contends that the draft EIR improperly segmented the "Omni gas station project" from environmental review of Omni's shopping center project, in violation of CEQA's prohibition on piecemeal review of the significant environmental impacts of a project. Highway 68 argues that the evidence in the administrative record shows that Omni is planning future development of the gas station site, and therefore the gas station project should have been included in environmental review of the adjacent shopping center project.

Omni acknowledges that redevelopment of the Exxon gas station site adjacent to the shopping center site has been contemplated, but asserts that no project application is pending and any future project would be implemented independently. Omni also asserts

38

that the draft EIR disclosed that the shopping center project included demolition of a building and potential soil remediation on the gas station site.

The California Supreme Court has established a test for segmentation, also known as piecemealing: "We hold that an EIR must include an analysis of the environmental effects of future expansion or other action if: (1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 396 (*Laurel Heights I*).) "Absent these two circumstances, the future expansion need not be considered in the EIR for the proposed project. Of course, if the future action is not considered at that time, it will have to be discussed in a subsequent EIR before the future action can be approved under CEQA." (*Ibid*.)

Thus, "[t]he requirements of CEQA cannot be avoided by piecemeal review which results from 'chopping a large project into many little ones—each with a minimal potential impact on the environment—which cumulatively may have disastrous consequences.' [Citations.]" (*Rio Vista Farm Bureau Center v. County of Solano* (1992) 5 Cal.App.4th 351, 370.) However, " 'where future development is unspecified and uncertain, no purpose can be served by requiring an EIR to engage in sheer speculation as to future environmental consequences.' [Citation." (*Laurel Heights I*, *supra*, 47 Cal.3d. at p. 395.)

The applicable standard of review is de novo: "Whether a project has received improper piecemeal review is a question of law that we review independently. [Citation.]" (*Paulek v. Department of Water Resources* (2014) 231 Cal.App.4th 35, 46.)

Our review indicates that future development of the Exxon gas station site that is adjacent shopping center project site is contemplated, but there is no pending proposal for a specific project on the gas station site. For example, the record reflects that the Board

39

of Supervisors requested Omni to provide information about the gas station site, as stated in the County Planning Departments report to the Board of Supervisors in connection with a May 17, 2011 meeting: "In response to Board direction to show what is intended for the corner parcel, the applicant [Omni] provided a sketch showing a schematic development plan for a gas station. As illustrated, the architecture would be consistent with the design of the center."

We also note that the FEIR included the following in the master responses to comments section: "Commenters have raised a number of questions with respect to the Project Description including a) whether or not the adjacent gas station site (also owned by the Project proponent) are included in the Project; . . . . The Project includes the Project Site as described below, but also relies upon runoff from the adjacent gas station site solely for the purpose of calculating water balance. [¶] Project Site. The Project Site consists of two lots of record occupying approximately 11 acres. The adjacent gas station site is not proposed for development as part of the proposed shopping center complex. Access to the gas station site is also separate from the access points to the Project."

Since it appears from the administrative record that development of the gas station site is contemplated, but was uncertain at the time the draft EIR was prepared, we determine that environmental review of a future gas station site project was not improperly segmented from Omni's shopping center project. The California Supreme Court stated in *Laurel Heights I* that CEQA does not require "discussion in the EIR of specific future action that is merely contemplated or a gleam in a planner's eye." (*Laurel Heights I, supra*, 47 Cal.3d at p. 398.)

### D. *Consistency with the General Plan*

Highway 68 also contends that the FEIR failed to analyze whether Omni's project was consistent with the County's 2010 general plan; the County did not seek the advice of the general manager of the Water Resources Agency as required by Policy 3.2 in the

40

general plan; and the County's finding on interlocutory remand that the project has a long term sustainable water supply is not supported by substantial evidence.

The County responds general plan consistency is not an issue reviewed under CEQA. We agree, since, as we have discussed, CEQA does not require an analysis of general plan consistency. (See *Pfeiffer*, *supra*, 200 Cal.App.4th at p. 1566.)

The County also argues that Highway 68 fails to meet its burden to show that no reasonable person would have reached the Board of Supervisor's conclusion that Omni's project has a long term sustainable water supply consistent with general plan Policies 3.1 and 3.2. Again, we agree.

Under the Government Code, every county and city is required to adopt " 'a comprehensive, long-term general plan for the physical development of the county or city. . . .' (Gov. Code, § 65300.) . . . ' "[T]he propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements." [Citation.]' [Citation.]" (*Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 815 (*Friends of Lagoon Valley*).)

" ' "An action, program, or project is consistent with the general plan if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment." [Citation.]' [Citation.] State law does not require perfect conformity between a proposed project and the applicable general plan. . . ." (*Friends of Lagoon Valley, supra,* 154 Cal.App.4th at p. 817.)

This court addressed the applicable standard of review in *Save Our Peninsula*, *supra*, 87 Cal.App.4th at p. 142.) "When we review an agency's decision for consistency with its own general plan, we accord great deference to the agency's determination. This is because the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity. [Citation.] . . . A reviewing court's role 'is simply to decide whether the city

41

officials considered the applicable policies and the extent to which the proposed project conforms with those policies.' [Citation.]" (*Ibid.*)

Accordingly, an agency's "findings that the project is consistent with its general plan can be reversed only if it is based on evidence from which no reasonable person could have reached the same conclusion. [Citation.]" (*A Local & Regional Monitor v. City of Los Angeles* (1993) 16 Cal.App.4th 630, 648 (*A Local*).) The party challenging a city's determination of general plan consistency has the burden to show why, based on all of the evidence in the record, the determination was unreasonable. (*Native Plant Society*, *supra*, 172 Cal.App.4th at p. 639.)

Here, as stated in Resolution No. 14-360, the Board of Supervisors clarified that the project "has a long-term, sustainable water supply, both in quality and quantity to serve the development in accordance with the 2010 Monterey County General Plan Policies PS-3.1 and PS-3.2 and is therefore consistent with Policies PS-3.1 and PS-3.2." The Board of Supervisors also stated in Resolution No. 14-360 that "[t]he Board's 2012 findings in support of approving the project implied that the project has a long term sustainable water supply and were based on substantial evidence in the record. The Board's finding today in response to the court's interlocutory order clarifies for the court that the Board intended to find and does hereby explicitly find that the project has a long term sustainable water supply."

Policies PS 3.1 and PS 3.2 were described as follows in Resolution No. 14-360: "Policy PS-3.1 of the 2010 Monterey County General Plan provides: 'new development for which a discretionary permit is required, and that will use or require the use of water, shall be prohibited without proof, based on specific findings and supported by the evidence, that there is a long-term, sustainable water supply, both in quality and quantity to serve the development.' [¶] . . . Policy PS-3.2 of the 2010 Monterey County General Plan provides criteria for developing an ordinance for determining whether a long term

42

sustainable water supply (LTSWS) exists. Until the ordinance is adopted, staff has used the criteria in Policy PS-3.2 for guidance."

The Board of Supervisors also summarized its findings in Resolution No. 14-360: "The project has a long term sustainable water supply because of the project's net positive water balance. The underground water recharge system approved for the project would return more water to the groundwater basin than the project would use. The Board acknowledges that the existing groundwater basin in the El Toro area is in overdraft; however, this project will not adversely affect the groundwater basin because the project's water use is limited to a maximum of 9.0 acre-feet per year (afy), and the underground water recharge system approved for the project would return 9.66 afy of water to the underground basin, which results in a net positive water balance. This evidence was presented to the Board prior to its 2012 approval of the project and was cited in its 2012 findings for project approval. In its intended decision, the Superior Court held that there is substantial evidence to support the County's 2012 findings and conclusions regarding the water balance analysis, the water demand analysis, and the recharge analysis (page 143 of the Order of lnterlocutory Remand). The Board by its finding today does not disturb its 2012 findings and conclusions regarding water balance, water demand, and recharge."

Having reviewed the Board of Supervisors's determination of general plan consistency, as stated in Resolution No. 14-360, we find that Highway 68 has not met its burden to show why, based on all of the evidence in the record, the determination of the Board of Supervisors was unreasonable. (*Native Plant Society*, *supra*, 172 Cal.App.4th at p. 639.). Therefore, we may not reverse the Board of Supervisor's finding of general plan consistency with respect to Policies 3.1 and 3.2. (See *A Local*, *supra*, 16 Cal.App.4th p. 648.)

### IV. DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondents.

43

_____

BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____

ELIA, ACTING P.J.

_____

MIHARA, J.

Filed 8/24/17

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE HIGHWAY 68 COALITION,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>COUNTY OF MONTEREY et al.,<br><br>    Defendants and Respondents;<br><br>OMNI RESOURCES LLC,<br><br>    Real Party in Interest and<br>    Respondent. | H042891<br>(Monterey County<br> Super. Ct. No. M116436)<br><br>ORDER CERTIFYING OPINION<br>FOR PARTIAL PUBLICATION |

THE COURT:

    The opinion in the above-entitled matter filed on July 31, 2017, was not certified for publication in the Official Reports. The Thomas Law Group; the County of Monterey; the California State Association of Counties; as well as the California Building Industry Association and the California Business Properties Association have requested the opinion be certified for publication. Under California Rules of Court, rules 8.1105(c) and 8.1110, the opinion is ordered published with the exception of parts B and C of III. Discussion.

_____
BAMATTRE-MANOUKIAN, J.


_____
ELIA, ACTING P.J.


_____
MIHARA, J.

| | |
|---|---|
| Trial Court: | Monterey County Superior Court |
| | Superior Court No.:  M116436 |
| | |
| Trial Judge: | Hon. Lydia M. Villarreal |
| | |
| Attorneys for Plaintiff and Appellant:<br>The Highway 68 Coalition | Douglas Philip Carstens<br>Amy Minteer<br>Chatten-Brown & Carstens |
| | |
| | Michael W. Stamp<br>Molly Erickson<br>Stamp / Erickson |
| | |
| Attorneys for Defendants and<br>Respondents:<br>County of Monterey and Board of<br>Supervisors of the County of Monterey | Charles J. McKee, County Counsel<br>Wendy S. Strimling, Senior Deputy County Counsel<br>Jesse J. Avila, Deputy County Counsel<br>Office of the Monterey County Counsel |
| | |
| Attorneys for Real Party in Interest and<br>Respondent:<br>Omni Resources LLC | Anna C. Shimko<br>Sigrid R. Waggener<br>Gail E. Kavanagh<br>Burke, Williams & Sorensen, LLP |
| | |
| | Brian Finegan<br>Brian Finegan & Michael J. Harrington, LLP |

*The Highway 68 Coalition v. County of Monterey*
**H042891**